**Raja El MAJZOUB, Individually and as the Representative of the Estate of Hassan El Majzoub, Deceased, and as Next Friend of Rojdi El Majzoub and Farah El Majzoub, Appellant,**

v.

**W. Douglas APPLING, M.D., Appellee.**

No. 01–00–00842–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 14, 2002.

Rehearing Overruled Jan. 24, 2003.

Richard C. Bax, Hansen, Bax & Schiffer, P.C., Houston, for Appellant.

John S. Serpe, Sheehy, Serpe & Ware, P.C., Richard M. Law, Dunn, Kacal,

Adams, Pappas & Law, P.C., Houston, for Appellee.

Panel on rehearing consists of Justices MIRABAL, HEDGES, and JENNINGS.

## OPINION ON REHEARING

TERRY JENNINGS, Justice.

We deny appellant's motion for rehearing. TEX.R.APP. P. 49.3. We withdraw our August 30, 2002 opinion, substitute this opinion in its place, and vacate our August 30, 2002 judgment.

In this medical malpractice case, appellant, Raja El Majzoub, individually, as representative of the estate of her husband, Hassan el Majzoub, and as next friend of their two children, appeals from the trial court's summary judgment in favor of appellee, Dr. W. Douglas Appling. In one point of error, Mrs. Majzoub argues the trial court erred in granting Dr. Appling's motion for summary judgment and in concluding that, as a matter of law, no physician-patient relationship existed between Appling and Mr. Majzoub before Majzoub suffered an anoxic brain injury.[1]

We affirm.

## Background

On September 16, 1997, Mr. Majzoub, complaining of difficulty in breathing, went to the Rosewood Medical Center emergency room at approximately 3:00 a.m. He was placed under the care of Dr. Vasif Humayun, the emergency room physician on duty. Dr. Humayun's physical examination of Majzoub revealed swollen lymph nodes, inflammation of the pharynx, enlarged, swollen tonsils covered with pus-like exudate, and a muffled, hoarse voice. Majzoub also had stridor.[2] After examining Majzoub, Dr. Humayun asked the nurse to telephone the on-call otolaryngologist.

Pursuant to Rosewood procedure, its answering service telephoned Dr. Appling, a board-certified otolaryngologist, and left a message. When Dr. Appling returned the telephone call at 3:15 a.m., he spoke to Dr. Humayun. Dr. Appling had never treated Majzoub. In his deposition, Dr. Appling described his telephone conversation with Dr. Humayun, in part, as follows:

[Dr. Humayun] told me he had seen a patient, 31–year–old obese male, come in with sore throat.... He had stridor, he had tonsillitis, and he had a positive strep test....

He then asked me how our group treated our patients with tonsillitis. And I replied, "Did you say he had stridor? Did you—is this guy's airway obstructed? Is the patient in acute airway distress?"

He said, "No, the patient's airway is not obstructed, he's not in acute airway distress. In fact, he's walking around and he's talking, and has normal $O_2$ sats. on pulse oximetry."

I said, "Well, is he having noisy breathing?" He said ["Y]es.["] I then asked him what did he see on his exam. He said he had large, inflamed tonsils that were almost touching. I asked him if one tonsil was larger than the other.... He said ["N]o, they were both symmetrically enlarged and almost touching.["]

---

1. Appellant raises a conditional second point of error arguing in favor of the trial court's decision to strike Dr. Appling's affidavit as summary judgment evidence. Because Dr. Appling does not contest that decision by cross-point, we need not address the issue. TEX.R.APP. P. 25.1.

2. "Stridor" is defined as a high-pitched sound, caused by a blockage in the throat or the larynx. THE AMERICAN ILLUSTRATED MEDICAL DICTIONARY 1453 (22d ed. 1951).

And then I said, "Well, you had told me that you had given him a shot of penicillin and that you had ordered a breathing treatment." And he said, "That's correct. I've already given him the penicillin shot."

I said, "Well, what we normally do with our patients is to give them a gram of Rocephin . . . and give them Dalalone. . . ."

. . . .

I said it probably wouldn't hurt to give him the—you know, an additional shot of the other antibiotic, and that I said, "You needed [sic] to observe the patient, especially after giving him the shot and the breathing treatment."

And he asked me how long we observed patients, and I told him that we usually, at least with the shot, have them wait 20 minutes; and with the breathing treatment, it could be 30 minutes to an hour.

. . . .

I then told him that . . . if anything changed, to call me, let me know. I reminded him that it took me about 25 minutes to get in to the hospital.

. . . .

And then I said, "Why don't you just give me a call after he finishes the breathing treatment and let me know how he's doing." And that was the end of the call. And the next call I received came later that morning sometime before 6:00 [a.m.]

. . . .

Dr. Humayun said that he was going to refer the patient to me. I said that was fine, to have the patient call me, set up an appointment that morning.

. . . .

He said that—"Would it be all right if I referred the patient to you?" I said that's—that's—that would be fine, to ask the patient to call me in the morning to set up an appointment, to tell him—try to set that appointment up for that—for that morning.

In his deposition, Dr. Humayun explained his reasons for contacting Dr. Appling, in part, as follows:

Q: What time did you call Dr. Appling?

A: About 3:15 [a.m.].

Q: And that would be after your examination?

A: After the examination.

Q: And when you finished your examination, you just weren't comfortable about what problem Mr. Majzoub might have?

A: Yes, I had an understanding of his problem.

Q: But you weren't entirely sure; is that correct?

A: You are never sure about anything.

Q: All right. So you consulted with someone who was a specialist in the area of your concern?

A: That's correct.

Q: And your number one concern was that the fact that you heard stridor?

A: That's correct.

. . . .

Q: And you knew stridor was bad, could be?

A: Could be.

Q: And so you wanted to call an ENT specialist; is that correct?

A: That's correct.

Later that morning, Majzoub stopped breathing and arrested in the emergency room. Dr. Humayun attempted to intubate him, was unsuccessful, and then performed an emergency tracheotomy. In the interim, Dr. Appling was called and was asked to come to the hospital to assist Dr. Humayun. When Dr. Appling arrived, he examined Majzoub for the first time

and transferred him to the intensive care unit. A subsequent EEG showed that Majzoub had no brain activity. Three days later, Majzoub died.

## Summary Judgment

In her first point of error, appellant contends that the trial court erred in granting summary judgment based on its explicit finding that, as a matter of law, Dr. Appling owed no duty to Majzoub because no physician-patient relationship existed between them before Majzoub suffered a cardiac arrest.[3]

In a motion for summary judgment, the movant has the burden to demonstrate there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *See Am. Tobacco Co. Inc. v. Grinnell,* 951 S.W.2d 420, 425 (Tex.1997). In determining the existence of a material fact issue that would negate a summary judgment, the trial court must take the evidence of the nonmovant as true, examine every reasonable inference, and resolve all doubts in the nonmovant's favor. *Lehrer v. Zwernemann,* 14 S.W.3d 775, 777 (Tex.App.-Houston [1st Dist.] 2000, pet. denied).

To prevail in a medical malpractice claim against a physician, a plaintiff must prove there was (1) a duty to conform to a particular standard of care, (2) a breach of that standard, (3) a resultant injury, and (4) a causal connection between the breach of the standard and the injury. *Wax v. Johnson,* 42 S.W.3d 168, 171 (Tex. App.-Houston [1st Dist.] 2001, pet. denied). The question of duty is a question of law, which a court must decide before reaching the standard of care. *St. John v. Pope,* 901 S.W.2d 420, 423 (Tex.1995). A physician cannot be liable for medical malprac-

tice unless the physician breaches a duty flowing from a physician-patient relationship. *Wheeler v. Yettie Kersting Mem'l Hosp.,* 866 S.W.2d 32, 38 (Tex.App.-Houston [1st Dist.] 1993, no writ). In considering whether a duty is owed, therefore, the trial court must first consider whether a physician-patient relationship was established.

A physician's duty to treat a patient with proper professional skill derives from the consensual relationship between patient and physician. *St. John,* 901 S.W.2d at 423. Only when this relationship exists can a breach of duty resulting in medical malpractice occur. *Id.* In *St. John,* the supreme court stated, "Creation of the physician-patient relationship does not require the formalities of a contract. The fact that a physician does not deal directly with a patient does not necessarily preclude the existence of a physician-patient relationship." *Id.* at 424.

A physician-patient relationship may be established at the express or implied consent of the physician. *Id.* at 423. While consent may be implied, the "on-call" status of a physician does not automatically impose a duty. *Id.* at 424. If there is no prior relationship between the physician and the patient, there must be some affirmative action on the part of the physician to treat the patient to create such a relationship. *Day v. Harkins & Munoz,* 961 S.W.2d 278, 280 (Tex.App.-Houston [1st Dist.] 1997, no writ). A physician does not need to have direct physical contact with a patient in order to establish a physician-patient relationship. *St. John,* 901 S.W.2d at 424.

Dr. Appling argues he gave no express or implied consent to create a physi-

---

**3.** Appellant does not assert a claim for medical malpractice for any acts or omissions by Dr. Appling that occurred after he arrived at the hospital.

cian-patient relationship with Majzoub. He also argues that he did not take any affirmative acts that established a physician-patient relationship with Majzoub and that his telephone conversation with Dr. Humayun was not enough to establish such a relationship.

Appellant argues that, although Dr. Appling never saw, talked to, or examined Majzoub before the anoxic brain injury, the recommendations Dr. Appling made to Dr. Humayun on the telephone, his request to be updated on Majzoub's condition, and his consent to try to see Majzoub in his office the following day established the existence of a physician-patient relationship. Appellant contends that Dr. Appling took affirmative action when he listened to Dr. Humayun's recitation of Majzoub's symptoms and suggested treatment in the form of additional medication, and when he requested that he be called and updated on Majzoub's status following the completion of the breathing treatments.

Dr. Appling relies on *Lopez v. Aziz*, 852 S.W.2d 303 (Tex.App.-San Antonio 1993, no writ). In *Lopez*, a treating physician consulted once by telephone with a colleague, who was an OB/GYN specialist, and then followed the specialist's advice. *Id.* at 304. The *Lopez* court concluded that the consulted doctor "did no more than answer the professional inquiry of a colleague. There is no evidence of any consensual basis for the existence of a physician-patient relationship arising out of that one telephone conversation." *Id.* at 306. The court held no physician-patient relationship was created between the specialist and the patient and affirmed the trial court's summary judgment in favor of the specialist. *Id.* In reaching its conclusion, the court noted the holding of a similar Michigan case, and quoted from it as follows:

Defendants' medical opinions were addressed directly to [the treating physician] as a colleague, and not indirectly to plaintiffs as patients. *The opinions were not in the nature of prescribed course of treatment, but were recommendations to be accepted or rejected by the [treating physician] as he saw fit.* In short, the telephone conversations between [the treating physician] and defendants did not give rise to a physician patient relationship. . . .

*Id.* at 306–07 (quoting *Hill By Burston v. Kokosky*, 186 Mich.App. 300, 463 N.W.2d 265, 267 (1990)) (emphasis added).

Appellant points out that *Lopez* is distinguishable from the present case because Dr. Appling (1) was on-call to answer inquiries from emergency room doctors, (2) agreed to try to see Majzoub the following day, (3) told Dr. Humayun it would take him about 25 minutes to come to the emergency room, if needed, and (4) asked to be updated on Majzoub's condition following the breathing treatments. Nevertheless, we note that because there was no prior physician-patient relationship between Mr. Majzoub and Dr. Appling, our focus is on whether Dr. Appling took some affirmative action to treat Majzoub. *See Day*, 961 S.W.2d at 280. Thus, we find the reasoning of *Lopez* to be persuasive.

In oral argument, counsel for appellant relied on *Lection v. Dyll*, 65 S.W.3d 696 (Tex.App.-Dallas 2001, pet. denied). In *Lection*, an emergency room doctor telephoned an on-call specialist to discuss a diagnosis of a patient. *Id.* at 707. The emergency room doctor telephoned the on-call specialist, "who had an obligation to the hospital to assist, and not merely because [the on-call specialist] was a colleague." *Id.* The emergency room doctor "sought and relied upon the [on-call physician's] diagnosis and treatment plan." *Id.* The *Lection* court noted:

The summary judgment record contains evidence that [the on-call physician] diagnosed Lection's condition, told [the emergency room physician] that no other treatment was necessary, and assured [the emergency room physician] that it was "all right" for her to have left the hospital. These statements constitute an evaluation of the information provided and *a medical decision concerning Lection's need for treatment and admission to the hospital* and thus are "affirmative acts" towards Lection's treatment. (citation omitted) We conclude the summary judgment evidence does not conclusively establish that [the on-call physician] made no affirmative acts of treatment toward Lection.

*Id.* (emphasis added).

Although Dr. Appling was consulted as an on-call physician and not merely as a "colleague," we find that *Lection* is substantively distinguishable. Before Majzoub was transferred to the ICU, Dr. Humayun retained the responsibility for his care and was free to accept or decline the recommendations provided by Dr. Appling. Dr. Appling did not proffer a medical diagnosis of Majzoub's condition and did not make any medical decisions with regard to Majzoub. Nothing in the record indicates that, at the time of their telephone conversation, either doctor contemplated that Dr. Appling's comments were binding on Dr. Humayun or that Dr. Appling had any responsibility to control the course of Majzoub's treatment. *See Lopez*, 852 S.W.2d at 307. Based on the summary judgment record, we conclude Dr. Appling did not take any affirmative action to treat Majzoub.

We hold that the summary judgment evidence established as a matter of law that there was no physician-patient relationship between Dr. Appling and Majzoub prior to the time Majzoub was transferred to the ICU. Therefore, we hold that the trial court did not commit error in granting Dr. Appling's motion for summary judgment.

We overrule appellant's point of error.

### Conclusion

Although a physician-patient relationship may be established by the implied consent of a physician, the "on-call" status of a physician does not automatically impose a duty. *St. John*, 901 S.W.2d at 424. Further, we hold that a duty is not automatically imposed when an on-call physician consults with an emergency room physician in regard to a patient. Nor is a duty necessarily imposed when a doctor agrees to see a patient at a future time. Rather, as we have noted before, without the express consent of the physician or a prior physician-patient relationship, there must be some affirmative action on the part of the physician to treat the patient to create such a relationship. *Day*, 961 S.W.2d at 280.

When a physician undertakes an affirmative action to treat a patient, the physician's consent to establish a physician-patient relationship may then be implied. Mere recommendations, made by an on-call physician, to be accepted or rejected by a treating physician do not constitute such an affirmative act. As noted by the *Kokosky* court:

> The extension of potential malpractice liability to doctors with whom a treating physician has merely conferred, without more, would unacceptably inhibit the exchange of information and expertise among physicians. This would benefit neither those seeking medical attention nor the medical profession.

*Kokosky*, 463 N.W.2d at 268. We agree with the *Lopez* court that to expose physicians to liability for simply conferring with

a treating physician would be detrimental in the long run to those seeking competent medical attention and is contrary to the public policy of this state. *See Lopez,* 852 S.W.2d at 307.

We affirm the judgment of the trial court.