Opinion issued September 28, 2006

 















In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-04-00551-CV
  __________
 
THAO CHAU AND HA DIEN DO, INDIVIDUALLY AND AS NEXT
FRIEND OF THEIR MINOR CHILDREN, S.D. AND H.D., Appellants
 
V.
 
JEFFERSON RIDDLE, M.D. AND GREATER HOUSTON
ANESTHESIOLOGY, P.A., Appellees
 

 
 
On Appeal from the 55th District Court
Harris County, Texas
Trial Court Cause No. 2002-36481-A




DISSENTING OPINION
          The majority opinion breathtakingly expands the scope of the Good Samaritan
affirmative defense. Because the majority’s construction of the statute is important
to the jurisprudence of this State and is, I believe, contrary to controlling law, I
respectfully dissent. I would reverse and remand this case for trial on the merits.
Background Facts
          This is an appeal from a summary judgment entered in favor of appellees
Jefferson Riddle, M.D. and Greater Houston Anesthesiology, P.A. (collectively,
GHA) and against appellants Thao Chau and Ha Dien Do, individually and as next
friend of their minor children, S.D. and H.D. (collectively, the Dos). Dr. Riddle,
whose actions are the subject of appellants’ underlying malpractice suit, was on call
for emergency anesthesiology services at Memorial Hermann Southwest Hospital
when appellant Thao Chau was admitted for an emergency caesarian section. Dr.
Riddle responded to the emergency and was associated with the delivery team
assembled by the obstetrician, Dr. Le, to provide anesthesiology services for the
delivery and immediate post-delivery care. S.D., one of Thao Chau’s twins delivered
by Dr. Le, was born floppy and did not begin breathing. Dr. Le asked Dr. Riddle to
intubate him. Having determined that he could safely leave the mother, Dr. Riddle
consented and intubated S.D. Dr. Riddle testified by affidavit that he used a
stethoscope to listen to S.D.’s chest and determined that air was traveling to the
baby’s lungs before returning to the mother. He did not secure the breathing tube and
then listen again to be sure it was in the right place, actions which the Dos’ expert,
Dr. Katz, testified are standard practice and would have taken a few seconds. Nor did
Dr. Riddle check S.D.’s end-tidal carbon dioxide to be sure that S.D. was properly
intubated. Instead, he handed S.D. off to the neo-natal team of residents and nurses,
who listened for breathing sounds, performed CPR, and administered epinephrine. 
Twelve minutes later, the on-call neonatologist, Dr. Ruiz-Puyana, arrived in the
delivery room, received S.D., and determined that he had been intubated into the
esophagus. She reintubated S.D., and he began to breathe. S.D. suffered severe
permanent brain damage due to lack of oxygen. 
          Months after the deadline in the trial court’s docket control order for
designating experts, filing new pleadings, and filing dispositive motions, GHA filed
new pleadings asserting the Good Samaritan affirmative defense, together with a
motion for summary judgment on that defense. The Good Samaritan defense invoked
by GHA, which has since been superseded, was then set out at section 74.001 of the
Texas Civil Practice and Remedies Code.


 At GHA’s request, the trial court enforced
its docket control order and a prior order limiting the Dos’ experts. The court
prohibited the Dos from designating an additional expert on the Good Samaritan
defense and struck summary judgment evidence critical to that defense on the
grounds that it was untimely filed and conclusory. The court did not enforce the
docket control order against GHA. It sustained GHA’s objections to the Dos’
summary judgdment proofs and overruled the Dos’ objections to GHA’s summary
judgment proofs. Following a hearing, the trial court granted summary judgment to
GHA and dismissed the Dos’ claims with prejudice. The majority affirms. I dissent.
Standard of Proof of Summary Judgment
          GHA filed a no-evidence and traditional summary judgment motion on the
Dos’ negligence claims and a traditional summary judgment on its Good Samaritan
affirmative defense. See Tex. R. Civ. P. 166a(b), (i). 
          Because a no-evidence motion for summary judgment places the burden on the
non-movant to present enough evidence to be entitled to a trial, a party moving for
summary judgment on an affirmative defense cannot bring a no-evidence motion for
summary judgment on that defense. Quanaim v. Frasco Rest. & Catering, 17 S.W.3d
30, 43 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). Rather, a defendant
moving for summary judgment on an affirmative defense must conclusively prove all
elements of that defense as a matter of law. American Tobacco Co. v. Grinnell, 951
S.W.2d 420, 425 (Tex. 1997); Montgomery v. Kennedy, 669 S.W.2d 309, 310–11
(Tex. 1984); Quanaim, 17 S.W.3d at 43. In reviewing a traditional motion for
summary judgment, the reviewing court must take all evidence favorable to the non-movant as true and make all reasonable inferences in favor of the non-movant. 
KPMG Peat Marwick v. Harrison County Housing Fin. Corp., 988 S.W.2d 746, 748
(Tex. 1999); Montgomery, 669 S.W.2d at 311; Quanaim, 17 S.W.3d at 41. If the
movant’s motion and summary judgment proof establish its right to summary
judgment as a matter of law, the burden shifts to the non-movant to establish a
genuine issue of material fact. Quanaim, 17 S.W.3d at 41–42. The existence of a
legal duty is a question of law for the court to decide based on the surrounding facts. 
See id. at 43. 
GHA’s Motion for Summary Judgment
          In their fifth issue, the Dos contend the trial court erred in entering summary
judgment in favor of GHA on its Good Samaritan defense and dismissing their
claims. I agree.
          Former Section 74.001 of the Civil Practice and Remedies Code
          Former section 74.001 of the Texas Civil Practice and Remedies Code, under
which GHA brought its motion for summary judgment, provided, in relevant part:
                    (a)     A person who in good faith administers emergency care 
. . . at the scene of an emergency but not in a hospital . . . is
not liable in civil damages for an act performed during the
emergency unless the act is wilfully or wantonly negligent.
 
                    (b)     This section does not apply to care administered:
 
                              (1)     for or in expectation of remuneration; or

                    . . . . 
 
                    (c)     If the scene of an emergency is in a hospital . . . a person
who in good faith administers emergency care is not liable
in civil damages for an act performed during the
emergency unless the act is willfully or wantonly negligent,
provided that this subsection does not apply to care
administered:
 
                              (1)     by a person who regularly administers care in a
hospital emergency room unless such person is at
the scene of the emergency for reasons wholly
unrelated to the person’s work in administering
health care; or
 
                              (2)     by an admitting or attending physician of the patient
or a treating physician associated by the admitting or
attending physician of the patient in question.
 
                    (d)     For purposes of subsections (b)(1) and (c)(1), a person who
would ordinarily receive or be entitled to receive a salary,
fee, or other remuneration for administering care under
such circumstances to the patient in question shall be
deemed to be acting for or in expectation of remuneration
even if the person waives or elects not to charge or to
receive remuneration on the occasion in question.

Former Tex. Civ. Prac. & Rem. Code Ann. § 74.001.
          Because it is undisputed that the scene of S.D.’s emergency intubation was a
hospital, former section 74.001(c) governs this case. To prove its Good Samaritan
defense under section 74.001(c), GHA had to establish as a matter of law that Dr.
Riddle administered care to S.D. in good faith in an emergency and was not wantonly
or wilfully negligent and that he was not excluded from the protection of the Good
Samaritan statute by former subsection 74.001(c)(1) or (c)(2). 
          The parties do not dispute that Dr. Riddle’s actions with respect to S.D. were
undertaken in an emergency and that they were not wantonly or wilfully negligent. 
However, in order to prove that Dr. Riddle was not excluded from the protection of
the Good Samaritan statute by former subsection 74.001(c)(1) or (2), GHA also had
to establish as a matter of law (1) that Dr. Riddle was not a person who regularly
administers care in an emergency room, or, if he was such a person, that he was at the
scene of S.D.’s intubation for reasons “wholly unrelated to [his] work in
administering health care,” and thus was not excluded from the protection of the
Good Samaritan statute by former subsection 74.001(c)(1) and (2) that Dr. Riddle was
not “a treating physician associated by the admitting or attending physician” for S.D.
and thus was not excluded from the protection of the Good Samaritan statute by
former subsection 74.001(c)(2). If GHA established as a matter of law that Dr.
Riddle was entitled to the protection of section 74.001(c) because he was at the scene
for reasons wholly unrelated to his work in administering emergency anesthesiology
services, satisfying subsection 74.001(c)(1), GHA would also have to prove (3) that
Dr. Riddle was not legally entitled to payment for his emergency services to S.D., i.e.,
he would not “ordinarily receive or be entitled to receive a salary, fee, or other
remuneration for administering care under such circumstances,” so that he was not
excluded from the protection of the Good Samaritan statute by former subsection
74.001(d), which applied when a physician contended he was not excluded by former
subsection 74.001(c)(1). See Former Tex. Civ. Prac. & Rem. Code Ann. §
74.001(c)(1) and (d).
          I would hold that GHA failed to prove as a matter of law that Dr. Riddle was
not excluded from the protection of the former Good Samaritan statute. Rather, the
summary judgment evidence raises substantial fact issues as to whether he was
excluded by former section 74.001(c)’s exclusionary provisions.


 Therefore, GHA
did not prove its entitlement to summary judgment.

(1)     Dr. Riddle’s exclusion from protection by former subsection 74.001(c)(1)

          Dr. Katz, the Dos’ expert, testified by affidavit:



7. When an anesthesiologist is “on call,” in our field of
anesthesiology the custom and practice is that the anesthesiologist “on
call” expects and anticipates that there will be emergencies. This is
something he is trained for when he is a resident in anesthesia. He (or
she) knows he is there to respond to emergencies requiring his skill and
expertise, and this a part of his routine and the reason he is needed in a
hospital. By virtue of being “on call,” an anesthesiologist is agreeing
and expecting to be responding to emergencies and procedures which
are performed without much advance notice. Indeed, being “on call,”
the anesthesiologist assumes the duty to provide anesthesia services on
an emergency basis to patients of the hospital. This duty arises out of
hospital protocols, his hospital privileges to practice anesthesiology and
provide coverage, his group’s agreement with the hospital, his
agreement to be “on call,” and professional standards of care.
 
Anesthesiologists who are hospital-based such as Dr. Riddle, who
work in the operating rooms and Labor and Delivery Rooms, and who
are “on call,” essentially specialize in responding to emergencies. An
anesthesiologist who is “on call” may be expected by the hospital to
perform services as complex and long as those for general anesthesia
during an operation, a cesarean section, or as simple and short as the
intubation of a patient, including newborns. 
 
Anesthesiologists routinely respond to emergencies in a hospital
because of our extensive experience and training in resuscitation. This
is part of our job and one of the reasons why we are needed at the
hospital to care for its patients. We have more training and experience
in intubating patients and can usually do so more quickly than other
physicians or health care providers during an emergency. A patient who
is not getting oxygen, or is getting little oxygen, is always an
emergency.

(Emphasis added.)
          Since Dr. Riddle was on call for emergency anesthesiology services and was
associated with the labor and delivery team to render anesthesiology services to Thao
Chau and her twins during the labor and delivery, it is logically impossible for GHA
to prove as a matter of law that Dr. Riddle was in the hospital for reasons “wholly
unrelated to [his] work” as an on-call anesthesiologist when he intubated S.D. and,
thus, that he was not excluded from the protection of the Good Samaritan statute by
former subsection 74.001(c)(1). Rather, all the evidence was to the contrary, i.e., that
he was excluded from protection as a Good Samaritan by subsection 74.001(c)(1). 
Notably, the panel does not even address this issue, even though GHA had to prove
all elements of the Good Samaritan statute to establish its entitlement to summary
judgment.
(2)     Dr. Riddle’s exclusion from protection by former subsection 74.001(c)(2)

          Likewise, it would seem to be impossible for GHA to prove as a matter of law
that Dr. Riddle was not excluded from the protection of the Good Samaritan statute
by former subsection 74.001(c)(2). That is, it would seem to be impossible for GHA
to prove, under the circumstances of this case, (1) that Dr. Riddle was not a treating
physician when he intubated S.D. and (2) that Dr. Riddle was not associated with the
labor and delivery team charged with S.D.’s delivery and immediate post-delivery
care assembled by Dr. Le. The majority, however, disagrees.
          The majority ignores the pertinent parts of the affidavit of Dr. Katz—the non-movants’ expert—in which Dr. Katz testifies exactly how, when, and why Dr. Riddle
was associated with S.D.’s care, established a physician/patient relationship with S.D.
as S.D.’s treating physician, and committed malpractice. Dr. Katz testified by
affidavit:
8. It is foreseeable that an anesthesiologist may have to intubate
a newborn when called to assist in a cesarian section such as the one in
this case. This is because it happens on an anesthesiologist’s watch
from time to time where there is no neonatologist, where he/she has not
yet arrived, or even where the neonatologist is present but requests
assistance. By virtue of the fact that a child is about to be delivered,
when a neonatologist is not present, the anesthesiologist knows that as
a part of the labor and delivery team, he may be sharing the care and
responsibility of the mother and child (or children) being delivered.
 
. . . . Generally, the decision for an emergency cesarean involves
the OB-GYN’s concern that the baby is in distress and not receiving
enough oxygen. By training and experience, an anesthesiologist has
more expertise in ventilating and intubating. He routinely performs
intubations for general anesthesia and is often called to perform
intubation or assist in difficult intubations, in an operating room or
otherwise, because he is usually the most qualified to do so. Where a
neonatologist is not present in the Labor and Delivery Room or the
neonatologist is having difficulty with intubation, from time to time an
anesthesiologist is needed to intubate the newborn if he can do so
because the mother is stable. In fact, he can expect that on occasion, he
will be needed to do this.
 
. . . .
 
10. In my opinion, Jefferson Riddle, M.D. failed to follow the
above standards of reasonable, prudent and accepted care for an
anesthesiologist in performing medical services for Thao Chau and
[S.D.], in at least the following acts or omissions:
 
                    1.       Dr. Riddle was [S.D.]’s treating physician while intubating
[S.D.]. He could have refused to intubate him if the
anesthetized mother was in crisis or medically unstable and
he had to choose her. However, once he agreed to intubate
[S.D.], laid hands on him, and undertook to intubate [S.D.],
Dr. Riddle became one of [S.D.]’s physicians. It was Dr.
Riddle’s responsibility to perform that intubation within
the standard of reasonably prudent anesthesia care.
 
                    2.       Specifically, the standard of care required him to intubate
properly—into the trachea—check for breath sounds with
a stethoscope to determine that he was properly intubated
into the trachea and not the esophagus, secure the
endotracheal tube, check end-tidal CO2 to ensure that the
tube was in the trachea and check again for breath sounds. 
These tasks only require a few seconds of an
anesthesiologist, who is already skilled and experienced at
this procedure and must do this before leaving the patient.
 
11. In this case, Dr. Riddle breached the standards of reasonably
prudent and acceptable anesthesia care and did not properly perform
the above which was below the standard of care. Specifically, he did
not secure the tube after intubation, then ensure that [S.D.] was properly
intubated by listening for breath sound again, after he had secured the
tube, to make sure it was still in the right place. He also did not check
the end-tidal CO2 to ensure the infant was properly intubated.
 
In fact, Dr. Riddle intubating [S.D.] without securing the tube and
ensuring it was in the right place likely caused more serious risk to
[S.D.] than if he had declined to do so at all, claiming he could not
leave the mother. As an anesthesiologist, he is considered to be more
skilled at intubation. It is highly likely that those who weren’t
anesthesiologists, especially the residents with limited experience,
assumed that if he did it, it must have been done correctly, and were
much less likely to question whether the baby’s difficulties were
whether they had a good airway. As a result, [S.D.] wasn’t reintubated
until the neonatologist arrived several minutes later and did so. This
contributed to the baby’s hypoxia and brain damage.
(Emphasis added.) The majority ignores this expert testimony directly on point, even
though we are required to review the non-movant’s evidence—not the movant’s—in
the most favorable light and to draw all reasonable conclusions in the non-movant’s
favor. KPMG Peat Marwick, 988 S.W.2d at 748. 
          The majority also errs by affirming the trial court’s order striking paragraph 9
of Dr. Katz’s affidavit on the irrelevant ground that one subsection of the paragraph
is “not . . . probative on the issue of whether Dr. Riddle was entitled to remuneration
for the intubation of S.D.” The expert testimony in this paragraph is highly probative
on the issue of whether Dr. Riddle was “a treating physician associated by the
admitting or attending physician” for S.D. and was thus excluded from the protection
of the Good Samaritan affirmative defense by former subsection 74.001(c)(2). Dr.
Katz testified in the relevant part of paragraph 9:
9. From the time that Dr. Riddle began providing the anesthesia
for the cesarean section in this case, he became “associated with” the
attending physician, Dr. Le. He became Dr. Le’s partner, associate or
colleague of the Labor and Delivery team, and they had to work together
for all the patients involved in the birth—the mother and the children. 
Both obstetrician and anesthesiologist in a C-section are treating both
the mother and the child because whatever they do to the mother is also
being done to and affects the child who is in that mother’s body,
whether by administering drugs, providing oxygen, and the like. It is
their job to care for both the mother and the child/children. So it is
disingenuous for an anesthesiologist during a C-section to say he had
no responsibility for the child, especially under the circumstances where
there was no neonatologist present, the baby was in distress, he had
undertaken to intubate the child, and his adult patient (the mother) was
not in crisis. It is below the standard of care for an anesthesiologist
providing anesthesia during a C-section to care for only the mother and
not the child as well where the mother is medically stable. Caring for
both is a juggling act the anesthesiologist must manage within the
standards of care.
 
[S.D.] was and would have been Dr. Riddle’s responsibility in
any event, as the “on call” anesthesiologist. If the mother had delivered
without C-section, and the baby was not breathing, in the absence of a
neonatologist, as the “on call” anesthesiologist, Dr. Riddle would likely
have been called in specifically for the baby who didn’t have an
established airway as the “on call” anesthesiologist.

(Emphasis added).

          Dr. Katz’s affidavit—with or without paragraph 9—is more than sufficient to
raise a fact issue as to whether Dr. Riddle was excluded from the protection of the
Good Samaritan statute as the anesthesiologist associated with the labor and delivery
team by the attending physician for the mother and children during the labor and
delivery, Dr. Le, and as S.D.’s treating physician for the delivery of emergency
anesthesiology services, including intubation.
          Nor can the majority find support for its legal conclusion in the law. It cites
no law in support of its conclusion that Dr. Riddle was not S.D.’s treating physician
for the intubation, and it ignores well-established Texas law to the contrary. Under
that law, a physician cannot be liable for malpractice unless he breaches a duty
flowing from the physician-patient relationship. St. John v. Pope, 901 S.W.2d 420,
423 (Tex. 1995); Majzoub v. Appling, 95 S.W.3d 432, 436 (Tex. App.—Houston [1st
Dist.] 2002, pet. denied). The question of duty is a question of law that must be
decided in a medical malpractice case before the issue of the standard of care arises. 
St. John, 901 S.W.2d at 424; Gross v. Burt, 149 S.W.3d 213, 221 (Tex. App.—Fort
Worth 2004, pet. denied); Majzoub, 95 S.W.3d at 436. The duty to treat a patient
with proper professional skill arises from the consensual relationship between the
physician and the patient. St. John, 901 S.W.2d at 423; Majzoub, 95 S.W.3d at 436. 
No formalities of contract are required. St. John, 901 S.W.2d at 424. While consent
to the physician-patient relationship may be implied, the “on-call” status of a
physician does not automatically impose a duty. Majzoub, 95 S.W.3d at 436. Rather,
if there has been no prior relationship between the physician and the patient, the
physician must take some affirmative action to treat the patient to create such a
relationship. Id.; Lection v. Dyll, 65 S.W.3d 696, 705 (Tex. App.—Dallas 2001, pet.
denied) (“[O]n-call physician may assume a duty to the patient if he takes some
affirmative action to treat the patient.”). Similarly, a physician’s mere presence in the
labor and delivery unit of a hospital is inadequate to establish a physician-patient
relationship unless the physician takes some affirmative step towards advancing the
relationship. Reynosa v. Huff, 21 S.W.3d 510, 513 (Tex. App.—San Antonio 2000,
no pet.). 
          A physician may decline treatment and thereby decline to create a physician-patient relationship, but once the physician agrees to examine or treat the patient, the
relationship arises. St. John, 901 S.W.2d at 424; Gross, 149 S.W.3d at 221–22;
Majzoub, 95 S.W.3d at 436. “Treatment” is defined as “the action or manner of
treating a patient medically or surgically.” Lection, 65 S.W.3d at 705 n.5. Once the
physician-patient relationship is established, the physician owes the patient a duty to
treat him with the skills of a trained, competent professional, and a breach of that duty
may give rise to a malpractice action. Gross, 149 S.W.3d at 222.
          Dr. Riddle was asked by Dr. Le, the head of the labor and delivery team, to
intubate S.D. He could have refused to do so had he determined that it was unsafe
to leave his primary patient, the mother, Thao Chau. St. John, 901 S.W.2d at 424;
Gross, 149 S.W.3d at 221–22; Majzoub, 95 S.W.3d at 436. However, having
determined that he could safely leave the mother, Dr. Riddle consented to treat S.D.
and became S.D.’s treating physician for the intubation, contrary to the majority’s
conclusion. See St. John, 901 S.W.2d at 424; Gross, 149 S.W.3d at 221–22;
Majzoub, 95 S.W.3d at 436.
          The majority, likewise, cites no law in support of its conclusion that Dr. Riddle
was not associated with the labor and delivery team, and therefore with S.D.’s care,
by the admitting or attending physician, Dr. Le, for his delivery and immediate post-delivery care. Rather, the majority states that 
Dr. Le testified that he was the attending physician for Ms. Chau, but
Dr. Ruiz-Puyana, the neonatologist, was the attending physician for S.D. 
Dr. Katz’s affidavit makes no contention that Dr. Riddle was, in any
way, associated with Dr. Ruiz-Puyana. As such, we hold that Dr. Riddle
was not associated with S.D.’s attending physician within the meaning
of the Good Samaritan statute.

The majority overlooks the material fact that Dr. Le was the head of the labor and
delivery team and that he associated Dr. Riddle with the team as anesthesiologist
before the delivery. It also overlooks the material facts that Dr. Ruiz-Puyana was an
on-call physician, exactly like Dr. Riddle, and that she did not arrive to take over
S.D.’s care until twelve minutes after Dr. Riddle intubated S.D. Thus, it is Dr. Ruiz-Puyana—not Dr. Riddle—who, under Texas law, might be able to argue that she had
no physician/patient relationship with S.D. at the time of the intubation. See
Majzoub, 95 S.W.3d at 436; Lection, 65 S.W.3d at 705.
          Under any reasonable interpretation of the law and the facts, GHA failed to
establish as a matter of law that Dr. Riddle was not excluded from the protection of
the Good Samaritan statute by either former subsection 74.001(c)(1) or former
subsection 74.001(c)(2). Rather, there is substantial evidence that he was excluded
from the statute’s protection. Because there is a material fact issue as to whether Dr.
Riddle was excluded from the protection of the Good Samaritan Statute, I would hold
that GHA’s motion for summary judgment fails. See Quanaim, 17 S.W.3d at 41–42. 
Consequently, unlike the majority, I would not find it necessary to determine whether
GHA satisfied former section 74.001(d) of the Code by establishing as a matter of law
that Dr. Riddle “would ordinarily receive or be entitled to receive . . . remuneration”
for the professional services he rendered to S.D.” when offering his services to S.D.
“for reasons wholly unrelated to [his] work in administering health care” in
accordance with subsections 74.001(c)(1) and (d). See Former Tex. Civ. Prac. &
Rem. Code Ann. § 74.001(c)(1), (d).
          I would sustain the Dos’ sixth issue. 
The Trial Court’s Order Striking Dr. Reeves and his Expert AffidavitsThe majority also errs in its holding, in response to the Dos’ first issue, that the
trial court did not err in striking the Dos’ expert on the Good Samaritan defense, Dr.
Reeves, and his affidavits, under a docket control order whose deadline for
designating experts expired on April 21, 2003,


 four months before GHA asserted its
Good Samaritan defense and simultaneously moved for summary judgment—in
pleadings untimely filed two months after the June 20, 2003 deadline in the same
docket control order for filing new pleadings, filing dispositive motions, and
challenging experts. Thus, GHA invoked the docket control order against the Dos at
the same time it was blatantly violating the same order.
          The Dos timely filed a response to GHA’s surprise August 29 motion for
summary judgment on its simultaneously asserted affirmative defense, attaching the
two affidavits from Dr. Reeves, one responding to the Good Samaritan defense and
one supporting the Dos’ malpractice allegations. On the afternoon of October 2, the
day before the summary judgment hearing, GHA filed its objections to the Dos’
summary judgment evidence and a motion to strike that evidence—18 days after the
evidence had been filed and a half-day before the scheduled hearing. GHA objected
to both of Dr. Reeves’ affidavits on the ground that Dr. Reeves was not properly
designated as an expert and, therefore, his affidavits could not be used in a summary
judgment context. It also argued that neither of Dr. Reeves’ affidavits showed
causation because neither “provides any explanation of how Dr. Riddle’s conduct
resulted in harm to S.D. or Plaintiffs.” GHA made similar objections to Dr. Katz’s
affidavits.
          The trial court began the hearing as scheduled the next day, October 3. At the
hearing, the Dos moved for a continuance on the ground that GHA had interjected a
great deal of new material into its reply to their summary judgment response and that
it had also objected to their summary judgment evidence only the day before. The
Dos sought additional time to respond to GHA’s pleadings, which they contended
were more in the nature of a new summary judgment motion than a reply, citing
surprise and their inability to respond to lengthy pleadings filed on the afternoon
before the hearing, including their inability even to contact their experts in the time
available to respond to GHA’s new pleadings. The Dos cited Texas Rule of Civil
Procedure 166a(c), which they contended entitled them to 21 days notice of new
summary judgment pleadings, and Rule 1, which provides that “[t]he proper objective
of rules of civil procedure is to obtain a just, fair, equitable and impartial adjudication
of the rights of litigants under established principles of substantive law.” See Tex.
R. Civ. P. 1, 166a(c); see also State v. Lowry, 802 S.W.2d 669, 671 (Tex. 1991)
(discouraging gamesmanship).
          The trial court continued the hearing until October 17 and ordered the Dos to
supplement their pleadings on or before October 10. On that date, the Dos filed their
second supplemental response and second supplemental designation of experts,
redesignating Dr. Reeves to testify on reasonable and necessary medical treatment
and the duties of physicians in response to GHA’s complaint that Dr. Reeves had
been improperly designated as a summary judgment witness. On October 14, three
days before the continued hearing resumed, GHA filed a motion to strike the Dos’
second supplemental designation of experts. GHA’s sole argument this time was that
the Dos’ designation of Dr. Reeves was untimely under the docket control order
setting April 21, 2003 as the final date for the plaintiffs’ designation of experts and
its order setting July 11, 2003 as the final date for choosing one physician to testify
on malpractice. In other words, GHA simply untimely recast its prior objections that
Dr. Reeves was not properly designated as an expert witness under the trial court’s
docket control order and under its order limiting the Dos’ experts. GHA again
requested that Dr. Reeves and his affidavits be struck.
          The hearing went forward as scheduled three days later, on October 17. By
order entered October 22, the trial court granted GHA’s motion for summary
judgment and its motions to strike Dr. Reeves as an expert witness and Dr. Reeves’
affidavits and portions of Dr. Katz’s affidavit as summary judgment evidence. The
court dismissed the Dos’ claims with prejudice.
          The majority erroneously states that the Dos did not respond to GHA’s motion
to strike Dr. Reeves’ affidavits and to strike the Dos’ second supplemental
designation of expert witnesses and thus the trial court did not err in striking Dr.
Reeves and his affidavits. Not only are the majority’s statements incompatible with
the record, but the Dos’ counsel expressly informed the panel at oral argument, upon
questioning by the panel, that the Dos’ responses to GHA’s motions to strike Dr.
Reeves and his affidavits were in the Dos’ response to GHA’s reply to the Dos’
response to GHA’s motion for summary judgment. This statement is borne out by a
review of the record. Thus, the majority’s affirmance of the trial court’s sanctions
order is based on an incorrect reading of the record. The factual support the majority
finds for the trial court’s actions is simply not there. Nor can the trial court’s
sanctions motion be justified on the basis of law. 
          Texas Rule of Civil Procedure 63 provides that “[p]arties may amend their
pleadings, respond to pleadings on file of other parties, . . . and file such other pleas
as they may desire by filing such pleas with the clerk at such time as not to operate
as a surprise to the opposite party.” Tex. R. Civ. P. 63 (emphasis added). The rule
further provides that pleadings, pleas, and responses filed within seven days of trial
“shall be filed only after leave of the judge is obtained, which leave shall be granted
by the judge unless there is a showing that such filing will operate as a surprise to the
opposite party.” Id. A summary judgment proceeding is a “trial” within the meaning
of this rule. Fletcher v. Edwards, 26 S.W.3d 66, 74 (Tex. App.—Waco 2000, pet.
denied); see also Sosa v. Cent. Power & Light, 909 S.W.2d 893, 895 (Tex. 1995) (per
curiam) (holding that Rule 63 applies to pleadings filed within seven days of
summary judgment proceedings). Here there was no showing that the Dos were not
surprised by GHA’s untimely objection to their expert and expert affidavits or that
they failed to bring their concerns to the attention of the trial court. The record
reveals quite the contrary.
          Notably, GHA did not couch its motion to strike Dr. Reeves and his affidavits
as a motion for the exclusion of testimony from an untimely designated expert under
Texas Rule of Civil Procedure 193.6. See Tex. R. Civ. P. 193.6. Had it done so, the
Dos would have had the opportunity to establish good cause for their late designation
of Dr. Reeves. See Alvarado v. Farah Mfg. Co., 830 S.W.2d 911, 914–15 (Tex.
1992) (discussing good cause to admit testimony not timely identified when Rule 215
discovery sanctions are sought and opining, “The good cause exception permits a trial
court to excuse a failure to comply with discovery in difficult or impossible
circumstances”); Cunningham v. Columbia/St. David’s Healthcare Sys., L.P., 185
S.W.3d 7, 11 (Tex. App.—Austin 2005, no pet.) (testimony from untimely designated
expert will be excluded “unless the trial court determines that the party seeking to
introduce the evidence established either (1) the existence of good cause for its failure
or (2) that it would not unfairly surprise or prejudice the other parties to admit the
evidence”).
          GHA merely sought enforcement of the docket control order against the Dos. 
Enforcement of a docket control order is reviewed under an abuse of discretion
standard. Clanton v. Clark, 639 S.W.2d 929, 931 (Tex. 1982); G.R.A.V.I.T.Y. Enters.,
Inc. v. Reece Supply Co., 177 S.W.3d 537, 544 (Tex. App.—Dallas 2005, no pet.). 
Exclusion of expert testimony is, likewise, reviewed under an abuse of discretion
standard. McIntyre v. Ramirez, 109 S.W.3d 741, 749 (Tex. 2003). A trial court
abuses its discretion if it acts arbitrarily, unreasonably, or without reference to
guiding rules or principles. Powers v. Mem’l Hermann Hosp. Sys., 81 S.W.3d 463,
465 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). 
          The trial court plainly was not following any rule of civil procedure,
specifically including Rule 193.6, its own docket control order, or any other
guidelines when it arbitrarily and capriciously accepted GHA’s invitation to enforce
its April 21 deadline for the Dos’ designation of experts and its June 20 order limiting
them to one expert physician while not enforcing the provisions in the same order
forbidding GHA from supplementing its pleadings after June 20, filing a motion for
summary judgment after June 20, and challenging expert witnesses after June 20. 
Rather, without any justification at all, the court deprived the Dos of any opportunity
to conduct discovery, name experts, or obtain summary judgment evidence on GHA’s
untimely asserted Good Samaritan affirmative defense. This is the very definition of
arbitrary and capricious enforcement of the rules to the prejudice of one of the parties. 
See Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241–42 (Tex. 1986)
(“The test for abuse of discretion is . . . whether the court acted without reference to
any guiding rules and principles.”). 
          GHA and the majority rely on Ersek v. Davis & Davis, P.C., 69 S.W.3d 268
(Tex. App.—Austin 2002, pet. denied), as authority for sustaining the trial court’s
ruling striking Dr. Reeves as an expert. Ersek is inapplicable here. In that case, the
plaintiff knew that his cause of action required expert testimony, yet he waited for
over a year after filing his claim to designate his expert. Id. at 270. Indeed, the
plaintiff contended that he had complied with the discovery rules by filing disclosures
“designating no expert witness before the deadline and then supplementing his
response identifying [the expert] after the deadline” in response to a motion for
summary judgment filed by the defendants. Id. at 270–71. In other words, in Ersek,
the plaintiff tried to sandbag the defendants and got caught. Here, exactly the
opposite is the case, and the defendants’ behavior here should be rewarded no more
than the plaintiff was rewarded in Ersek. Rather, I agree with Texas Rule of Civil
Procedure 1 that the “[t]he proper objective of rules of civil procedure is to obtain a
just, fair, equitable and impartial adjudication of the rights of litigants under
established principles of substantive law.” Tex. R. Civ. P. 1. I also agree with the
Supreme Court of Texas that we should not reward gamesmanship and secrecy. See
Alvarado, 830 S.W.2d at 915; Lowry, 802 S.W.2d at 671. 
          The majority also relies on Cunningham, 185 S.W.3d 7, cited above. Its
reliance on that case is also misplaced. As stated above, Cunningham holds that if
a party fails to timely designate an expert witness “then testimony from that expert
will be excluded unless the trial court determines that the party seeking to introduce
the evidence established either (1) the existence of good cause for its failure or (2)
that it would not unfairly surprise or prejudice the other parties to admit the evidence
despite the inadequate discovery.” 185 S.W.3d at 11. Cunningham lends no support
to the trial court’s rulings in this case. Indeed, as the Cunningham court aptly opined,
“A primary purpose of the discovery rules is to prevent trial by ambush.” Id. at 14;
see also Alvarado, 830 S.W.2d at 915. That purpose was entirely ignored by both the
trial court and the majority, and it does apply here—to GHA, not to the Dos.
          I would hold that the trial court’s orders striking the Dos’ expert, Dr. Reeves,
and his affidavits were clearly arbitrary and capricious, and I would sustain the Dos’
first issue.
The Trial Court’s Order Striking Portions of Dr. Katz’s Affidavit and
Overruling the Dos’ Objections to GHA’s Evidence

          In their second issue, the Dos contend the trial court erred in striking
paragraphs 6 and 9 of Dr. Katz’s affidavit. Paragraph 9 is set out in part above, and
both paragraphs are set out in the majority opinion. 
          Paragraphs 6 and 9 of Dr. Katz’s affidavit constitute the Dos’ summary
judgment proofs regarding Dr. Riddle’s status as an on-call anesthesiologist and as
the anesthesiologist charged with administering anesthesiology during the C-section
and delivery in this case, the standard of care Dr. Riddle owed S.D. in those
circumstances, and his right to charge for his services in administering anesthesiology
to the mother and the infants in her body and in intubating S.D. after his birth. In
agreeing with the trial court’s order striking these paragraphs, the majority cursorily
addresses only Dr. Katz’s opinion regarding Dr. Riddle’s right to charge for his
services, misconstrues the import of Dr. Riddle’s testimony on that point, determines
Dr. Katz’s testimony is conclusory, and then affirms the order striking all of the
critical summary judgment proof contained in these paragraphs with no further
argument or citation to authority. It states that “[w]hile Dr. Katz purported to have
personal knowledge of the facts recited in his affidavit, his statement regarding Dr.
Riddle’s entitlement to compensation is a legal conclusion with no supporting facts
or rationale,” and, therefore, it was properly struck as “conclusory.” I would hold that
it was error for the trial court to strike any of this vital testimony.
          The majority relies on a statement in McIntyre v. Ramirez, in which the
Supreme Court of Texas held, shortly before GHA filed its motion for summary
judgment, that a Maryland doctor was not qualified to testify about “what’s ordinarily
billed or what the law ordinarily allows people to recover for their medical services
in the State of Texas.” McIntyre, 109 S.W.3d at 750. In McIntyre, the defendant
obstetrician, Dr. McIntyre, was not on call, but happened to be in a hospital labor and
delivery area visiting one of his own patients when he responded to an emergency
page for Ramirez, whom he had never seen, but who was in the process of delivering
an infant with no doctor present; there were indications that the infant’s shoulder had
become lodged against the mother’s pelvic bone, a condition called shoulder dystocia;
and the infant, whom Dr. McIntyre delivered after several unsuccessful attempts,
suffered neurological impairment as a result of the shoulder dystocia. See id. at 743. 
The Ramirezes’ expert, a Maryland obstetrician, opined conclusorily that Dr.
McIntyre “was entitled to bill and receive a fee for the delivery of baby Colby
Ramirez.” Id. at 749. 
          The Supreme Court of Texas first addressed Ramirez’s claim that Dr.
McIntyre’s inability to avail himself of the Good Samaritan statute was established
by Dr. McIntyre’s testimony that he practiced obstetrical medicine, he routinely
delivered babies at the hospital, and he was in the hospital for the purpose of treating
his own obstetrical patient, from whom he expected to be compensated, on the day
he delivered Colby Ramirez. Id. at 749. The court opined, “The testimony cited by
Ramirez is not probative of the circumstances of this case, which involved a medical
emergency and an absence of any pre-existing relationship or duty to respond to that
emergency.” Id. In other words, the fact that Dr. McIntyre was an obstetrician who
was visiting his own patient in the hospital, where he was not on call, did not
establish either that he had a pre-existing relationship with Ramirez or that he had a
duty to deliver her baby. The unpredicated legal conclusion of Ramirez’s expert, an
obstetrician practicing in Maryland, “with no supporting facts or rationale” did not
raise a fact question sufficient to defeat summary judgment. Id. at 749–50.
          I have no disagreement with the supreme court’s rationale or holding in
McIntyre, but I disagree with the majority in this case that the rationale of McIntyre
applies here. The issue under former subsections 74.001(c)(1) and (d) in this case,
if it were to be reached, is whether Dr. Riddle had a legal right to bill for his services
assuming (as I do not) that he intubated S.D. “for reasons wholly unrelated to [his]
work in administering health care” and thus was not excluded as a Good Samaritan
by former subsection 74.001(c)(1). If he did have a legal right to bill for the post-delivery intubation, he would still be excluded as a Good Samaritan by former
subsection 74.001(d), even if his services were entirely voluntary and not part of his
job as the on-call anesthesiologist and even if he did not bill for them. Specifically,
former subsection 74.001(d) provided that, for purposes of former subsection
74.001(c)(1), “a person who would ordinarily receive or be entitled to receive a
salary, fee, or other remuneration for administering care under such circumstances to
the patient in question shall be deemed to be acting for or in expectation of
remuneration even if the person waives or elects not to charge or to receive
remuneration on the occasion in question.” Former Tex. Civ. Prac. & Rem. Code
Ann. § 74.001(d). Thus, under former subsections 74.001(c)(1) and (d), if GHA had
established that Dr. Riddle was not at the hospital for the purpose of rendering
emergency anesthesiology services, such as intubation, when he intubated
S.D.—which it did not prove, in contrast to the McIntyre defendant—it would still
have had to prove, for purposes of satisfying former subsection 74.001(d), that an on-call staff anesthesiologist, called to deliver emergency anesthesiology services to a
patient in Texas, is not legally entitled to charge for those services.
          Dr. Katz , having testified to Dr. Riddle’s duties as the on-call anesthesiologist
for the hospital where S.D. was born and his duties as the member of the delivery
team charged with providing anesthesiology and related services during and after the
delivery, testified regarding Dr. Riddle’s legal right to charge for those services in
paragraph 5 of his affidavit, which was not struck, and paragraph 6, which was
improperly struck:
5. I have knowledge and experience in the practice of medicine
and the specialty of anesthesiology. Thus, I am familiar with the
standards of reasonably prudent, ordinary and accepted care for an
anesthesiologist. This includes the standards of an anesthesiologist who
is “on call,” who is on the medical team for an emergency C-section for
the birth of a child, and who is providing anesthesia, intubation, and
related services in cases like or similar to the C-Section for Thao Chau
and the birth of [S.D.]. These standards of care are national standards,
which apply throughout the country to anesthesiologists who provide
medical services like or similar to those which should have been
provided for Thao Chau and her child, [S.D.], under the same or similar
circumstances.
 
6. Anesthesiologists are hospital-based doctors, meaning we
rarely have offices where we see patients, and usually our medical
practice is at a hospital. When we render anesthesia services, we expect
to be compensated, whether we perform those services “on call” or
during the regular workday; it is our practice to charge (or for the
hospital to charge if we are salaried and at a teaching facility) for those
services.

(Emphasis added.) 
          In the earlier paragraphs of his affidavit and in his curriculum vitae attached
to his affidavit, Dr. Katz fully established his credentials for opining as to national
standards of care and conditions of service and billing for an on-call anesthesiologist
on the staff of a hospital, and opined as to the substance of those national standards,
which he explained in detail. He also opined as to his extensive review of the records
and materials in the case. Dr. Katz’s improperly struck testimony in paragraph 6 is
thus entirely unlike the affidavit of the plaintiffs’ expert in McIntyre, a physician
board-certified in Maryland, who opined, without substantiation or credentials, about
local billing practices in Texas under the unusual circumstances in which the
defendant physician who delivered emergency care was in the hospital fortuitously,
was not on call, and was not associated with the delivery team by the attending
physician, but merely responded to an emergency call. McIntyre, 109 S.W.3d at 749.
It is this kind of testimony—not the testimony of an expert on national anesthesiology
standards opining on those standards—that the supreme court properly characterized
as presenting “a legal conclusion with no supporting facts or rationale” and, therefore,
incompetent to defeat summary judgment. See id. at 749–50; see also Ryland Group,
Inc. v. Hood, 924 S.W.2d 120, 122 (Tex. 1996) (per curiam). 
          Even without paragraph 6, I would hold that Dr. Katz’s testimony raised a
material fact issue as to whether Dr. Riddle was legally entitled to charge for the
emergency intubation he performed in the course of his work as the on-call
anesthesiologist and as the anesthesiologist associated with the labor and delivery
team by Dr. Le. However, I would also consider the evidence in paragraph 6, which
is, in my view, clearly competent expert testimony by the non-movant’s expert on a
material fact issue. 
          Moreover, because I believe the trial court improperly struck Dr. Reeves’
affidavit, I would include it also in my analysis. See Trusty v. Strayhorn, 87 S.W.3d
756, 764 (Tex. App.—Texarkana 2002, no pet.) (“assuming the failure to timely
designate a testifying expert [under docket control order] would bar consideration of
that expert’s affidavit as summary judgment proof, such a failure is a defect of form
to which a party must object and obtain a ruling to preserve error”; it does “not make
[the] affidavit incompetent, but inadmissible on proper objection.”); Lection, 65
S.W.3d at 703 (failure to timely file summary judgment proof is defect of form, not
substance). Dr. Reeves reviewed the billing records and testified, in the affidavit
struck by the trial court, that Dr. Riddle did, in fact, charge for his professional
services for the entire time he spent in the delivery room, including the time spent
intubating S.D.—testimony that contradicted Dr. Riddle’s testimony in his own
affidavit. The majority, having held that Dr. Reeves’s testimony was properly struck,
does not mention this testimony. I would hold, by contrast, that Dr. Reeves’
testimony, too, was more than sufficient to raise a fact issue as to Dr. Riddle’s self-serving and conclusory contention—as movant for summary judgment—that he was
not entitled to bill for those services.



          I would sustain the Dos’ second issue. I would hold that the trial court acted
arbitrarily and capriciously in striking paragraphs 6 and 9 of Dr. Katz’s affidavit. In
addition, if I were to reach the issue of whether GHA bore its burden of proving as
a matter of law that Dr. Riddle was not excluded from the protection of the Good
Samaritan statute by subsections 74.001(c)(1) and (d), I would hold that it did not
carry its burden. 
Conclusion
          Because GHA did not establish its Good Samaritan affirmative defense as a
matter of law, I would reverse and remand this case for trial on the merits.




                                                                        Evelyn V. Keyes
                                                                        Justice
Panel consists of Justices Nuchia, Keyes, and Hanks.
Justice Keyes, dissenting.