**Jenny Lee WAX and Her Husband, Alan Taylor, M.D., Appellants,**

**v.**

**Craig D. JOHNSON, M.D., and The Methodist Hospital, Appellees.**

No. 01–98–01202–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 1, 2001.

Rehearing Overruled May 3, 2001.

Robert D. Rapp, Houston, for appellant.

Andrea F. Lopes, Lisa Lynne Lepow, Houston, for appellee.

Panel consists of Justices COHEN, TAFT, and PRICE.[*]

## OPINION

PRICE, Justice (Assigned).

Appellants, Jenny Lee Wax and her husband, Alan Taylor, M.D., appeal the take-nothing judgment awarded appellees, Craig Johnson, M.D., and The Methodist Hospital, following a medical malpractice jury trial. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 29, 1993, Wax arrived at The Methodist Hospital's emergency room complaining of abdominal pain. After the emergency-room physician evaluated Wax, the physician called gastroenterologist Dr. Ray A. Verm, who admitted Wax to the hospital.

When Verm examined Wax on April 29, he determined Wax was suffering from a fecal impaction. Dr. Verm followed Wax's condition until the evening of April 30, when Dr. Johnson became the on-call physician for Dr. Verm's patients. Johnson was a solo practitioner who shared office space with Dr. Verm and Dr. Carl Schmulen, another gastroenterologist. Drs. Verm, Schmulen, and Johnson provided coverage for each other on weekends and holidays and had done so for almost 15 years.

Johnson first saw Wax sometime after 10:00 a.m. on May 1 during his regular morning rounds. If a nurse had called Johnson and told him he was needed at the hospital earlier than the time of his rounds, Johnson would have gone to the hospital at that time. Verm did not indicate that Johnson should see Wax earlier than when Johnson made his normal rounds. Verm also did not provide Johnson with any information about Wax other than putting her name on the list of his patients he gave to Johnson and providing a brief description of her problem. The first time Johnson was aware of Wax was when he saw her name on his list of patients, which he picked up the morning of May 1.

Verm had ordered laboratory work for May 1 and indicated Johnson was to check Wax's complete blood count results (CBC), including the white blood count (WBC) in the morning on May 1. The May 1 CBC was the first CBC obtained after a test done on April 29. The unverified results of the May 1 CBC were available on the laboratory computer at 7:24 a.m.

When Johnson checked Wax's laboratory results in the morning of May 1, howev-

---

[*] The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

er, the CBC was not yet on the hospital computer. The verified results were not on the hospital computer until 10:22 a.m., and Johnson did not telephone the hospital laboratory for the CBC. Johnson continued Wax on a treatment plan intended to avoid surgery if at all possible.

Sometime after 7:00 p.m. on May 1, Wax underwent surgery, and it was determined she had a complete bowel obstruction. The surgeon removed 11 inches of Wax's bowel. Wax's expert, Dr. Bernard Vine, testified that a portion of the small bowel was dead and required resectioning hours before Dr. Johnson saw Wax on the morning of May 1.

Just before surgery, Johnson obtained the WBC results. The WBC exceeded 25,000 and was designated critical by the laboratory. According to Johnson, the WBC was important, but, given the plan to avoid surgery, he would not have changed the treatment plan had he learned of the WBC earlier.

Appellants Wax and Taylor sued The Methodist Hospital and Drs. Johnson and Verm. Verm was never served and did not appear at trial.

Taylor's complaint against the hospital was that it did not communicate the laboratory values to the nurses, who, therefore, could not communicate them to the doctor.[1] Taylor's complaints against Johnson alleged Johnson failed to obtain the WBC on the morning of May 1, as Verm had instructed, and thereafter Johnson did not request or obtain the result when Taylor called him during the afternoon of May 1 informing Johnson of his concern.

When appellants attempted to use Johnson's deposition testimony that he assumed responsibility for Wax on April 30, John-

son objected and argued he had no legal duty to Wax before he saw her on May 1. In sustaining the objection, the trial court ruled, as a matter of law, Johnson had no duty to Wax before that time. The trial court did not instruct the jury on the legal ruling.

Appellants then attempted to ask Johnson why he did not follow his usual policy of communicating with an associate before the transfer of care. When Johnson objected that the question related to the standard of care before Wax became Johnson's patient at 10:00 a.m., the trial court limited the questioning to when Johnson first saw Wax. Despite this limitation, appellants next focused on Johnson's policy of communicating the condition of the patients transferred among the covering physicians. Appellants then asked Johnson why he decided not to discuss Wax's situation with Verm. Johnson responded it was Verm's responsibility to tell Johnson about Wax because Verm was the transferring physician.

During this line of questioning, Johnson again objected. The trial court indicated that, if appellants persisted in asking about Johnson's action or inaction before seeing Wax, the court would instruct the jury on the legal commencement of Johnson's duty. Appellants did not pursue the questioning, and the court did not instruct the jury.

When appellants questioned the hospital's laboratory supervisor about whether Johnson could have obtained the WBC at 7:24 a.m., Johnson objected that there was absolutely no evidence that Johnson had anything to do with Wax before 10:00 a.m. Appellants were permitted to ask, in general terms, whether any doctor or nurse

---

1. In this Court, appellants do not raise an allegation of error in relation to their case against the hospital.

could have obtained the information. Appellants continued this line of questioning, and the court permitted the supervisor to answer, but repeated it had already stated that, as a matter of law, Johnson did not have a duty to Wax at that time.

Finally, appellants attempted to read into evidence testimony from Johnson's expert that Johnson agreed to assume Wax's care on April 30, 1993. Johnson objected, and the trial court sustained the objection, saying, "As I previously stated, the Court has found that the duty of Dr. Johnson started when he first saw the patient on the morning of May the 1st."[2] Appellant's only other offer of proof was deposition testimony in which Johnson stated he considered himself Wax's treating physician and responsible for her care when he took over her treatment on April 30. Johnson, however, had corrected his deposition testimony to indicate he assumed responsibility on May 1.

## DISCUSSION

Appellants present the following three issues for review: (1) whether, when a physician is covering for an associate, a physician-patient duty can arise before face-to-face contact between the covering physician and the patient; (2) whether a court deciding the first question should follow *St. John v. Pope*[3] or *Ortiz v. Shah,*[4]

and (3) whether the trial court erred in excluding evidence of the covering physician's actions or inactions before face-to-face-contact with the patient. Appellants acknowledge these issues are but variations of a single issue.

■ Under the specific facts presented here, appellants therefore ask this Court to decide whether a physician who covers for an associate and is "on-call" for that associate's patients, but who receives no calls and receives no directions from the associate to see the patient at a particular time, owes a duty to the patient before the physician sees the patient personally. We conclude he owes no duty.

■ To recover on a medical malpractice claim, a plaintiff must establish the following elements: (1) a legally cognizable duty requiring the physician to conform to a certain standard of care or conduct, (2) the applicable standard of care, (3) a breach of that standard, (4) injury, and (5) a reasonably close causal connection between the breach and the injury the plaintiff suffered. *See Wheeler v. Yettie Kersting Memorial Hosp.*, 866 S.W.2d 32, 37 (Tex.App.—Houston [1st Dist.] 1993, no writ). The question of duty is a question of law, which a court must decide before reaching the standard of care. *St. John v. Pope*, 901 S.W.2d 420, 424 (Tex.1995).

---

2. Only in the last two instances did the trial court say anything in the presence of the jury that would indicate its position on when Johnson's duty began. In its charge to the jury, the court did not include an instruction or a question on when Dr. Johnson's duty commenced.

In their brief in this Court, appellants refer to the trial court's having precluded their experts' testimony. The reporter's record contains witnesses' references to having heard the testimony of plaintiff's experts, but the proffered expert testimony is not part of the record on appeal. There is nothing for this Court to review regarding the purported exclusions of expert testimony.

3. 901 S.W.2d 420, 424 (Tex.1995) (stating lack of direct contact with patient does not necessarily preclude existence of physician-patient relationship).

4. 905 S.W.2d 609, 611 (Tex.App.—Houston [14th Dist.] 1995, writ denied) (holding no physician-patient relationship established when on-call physician had no contact with patient and did not provide advice concerning patient).

█ A physician's duty to treat a patient with proper professional skill derives from the consensual relationship between patient and physician. *Id.* at 423. Only when this relationship exists can a breach of duty resulting in medical malpractice occur. *Id.* In *St. John,* the supreme court stated, "Creation of the physician-patient relationship does not require the formalities of a contract. The fact that a physician does not deal directly with a patient does not necessarily preclude the existence of a physician-patient relationship." *Id.* at 424.

In *St. John,* however, the court ruled no relationship existed between a patient and a hospital's on-call internist who simply recommended that an emergency-room patient diagnosed with lower back pain and acute psychosis be referred to a hospital with a neurosurgeon or to the physician who had performed the patient's previous back surgery. *Id.* at 421–22, 424. In the patient's appeal from the grant of summary judgment in favor of the physician, the court pointed to the physician's affidavit stating he never agreed to treat the patient. The court then observed, "If any agreement existed which divested [the physician] of the discretion to choose whether to treat a patient, it was incumbent on [the patient] to present it in order to preclude summary judgment for the doctor." *Id.* at 424.

In contrast, in *Hand v. Tavera,* the San Antonio Court of Appeals concluded a physician's summary judgment evidence did not refute the existence of a physician-patient relationship. 864 S.W.2d 678, 678 (Tex.App.—San Antonio 1993, no writ). The patient's evidence of the relationship consisted of clauses in the physician's employer's contract with the provider of the patient's health-care plan. The clauses obligated the employer's doctors to treat enrollees of the plan as they would treat their own patients. *Id.* at 679. The court specifically rejected the physician's claim the patient was not a third-party beneficiary of the contract between the doctor's employer and the plan's provider. *Id.* at 680.[5] *See also Dougherty v. Gifford,* 826 S.W.2d 668, 674–75 (Tex.App.—Texarkana 1992, no writ) (holding physician-patient relationship existed as matter of law between patient and pathologist with whom patient's physician contracted to perform laboratory work for benefit of patient).

In the present case, any agreement that Johnson treat Wax was an agreement between Verm and Johnson. Johnson's testimony indicated the agreement was for the benefit of the physicians, allowing them to leave town or take time-off during weekends.

█ Texas courts have recognized the existence of a duty only when the physician was party to a contract for the benefit of the patient or had taken an active step in treating the patient. *See, e.g., Wheeler,* 866 S.W.2d at 39–40 (holding duty existed when physician evaluated patient's status and approved transfer); *see also Fence v. Hospice in the Pines,* 4 S.W.3d 476, 480 (Tex.App.—Beaumont 1999, pet. denied) (concluding physician-patient relationship existed when physician participated in patient's certification and admission to hospice, as well as in ensuing treatment and care); *Hand,* 864 S.W.2d at 680 (holding duty existed when patient who had enrolled in prepaid medical plan went to hospital emergency room and plan's designated doctor was consulted); *Dougherty,*

---

5. The physician in *Hand* had also taken some action in relation to the patient. He had discussed the patient's condition with the emergency room physician and had recommended a pain reliever. *Hand v. Tavera,* 864 S.W.2d 678, 679 (Tex.App.—San Antonio 1993, no writ).

826 S.W.2d at 675 (holding physician-patient relationship existed as matter of law between patient and pathologist with whom patient's physician contracted to perform laboratory work for benefit of patient).

We find no Texas case that imposes a duty on a physician without such an agreement or affirmative act on the part of a physician. *Cf. St. John*, 901 S.W.2d at 424 (concluding no duty existed when physician listened to symptoms and made conclusion about patient's condition but did so only for purposes of determining whether physician should take case and when physician at no time agreed to examine or treat patient); *Fought v. Solce*, 821 S.W.2d 218, 220 (Tex.App.—Houston [1st Dist.] 1991, writ denied) (holding no physician-patient relationship established when on-call orthopedist was called by emergency-room physician to discuss patient's condition, but orthopedist declined to come to hospital to examine patient); *cf. also Reynosa v. Huff*, 21 S.W.3d 510, 513 (Tex.App.—San Antonio 2000, no pet.) (holding no physician-patient relationship established between physician and mother of child being delivered when physician, who was present in operating room and supervising residents performing cesarean deliveries, never saw mother and never gave advice about how to care for mother); *Ortiz v. Shah*, 905 S.W.2d 609, 611 (Tex.App.—Houston [14th Dist.] 1995, writ denied) (holding no physician-patient relationship established when on-call physician never saw patient, talked to him, or gave any advice to anyone in emergency room about patient); *Lopez v. Aziz*, 852 S.W.2d 303, 307 (Tex.App.—San Antonio 1993, no writ) (holding no physician-patient relationship established when attending physician consulted defendant physician and followed his advice, but defendant physician had not been in professional relation with attending physician, did not cover for him, did not examine patient, and never accepted any work relating to patient's case).

Given the specific facts of the present case, we are reluctant to depart from the rule requiring a contract or an affirmative act on the part of the physician before a legal duty arises. Johnson was not aware of Wax until Johnson saw her name on the chart when he made his rounds May 1. Apparently, no one from the hospital called Johnson before that time to inform him of Wax's condition. Verm did not provide Johnson with any information that would lead Johnson to believe he should depart from his normal practice in making rounds.[6]

Under the facts in this case, we hold that Johnson owed no duty to Wax until he saw her sometime after 10:00 a.m. on May 1. Accordingly, the trial court did not err in excluding evidence of Johnson's actions or inactions before that time and did not err in excluding his deposition testimony that he believed he assumed responsibility for Wax on April 30.[7]

---

**6.** Our holding in this case is limited to the facts of the case. We take no position on whether Johnson's duty would have arisen earlier had either Verm or the hospital provided Johnson with different information.

**7.** Given the gravamen of appellants' complaint against Johnson, *i.e.*, that he did not check the WBC earlier than the evening of May 1, we do not see how placing Johnson's duty earlier than the time of his rounds would have made a difference. The WBC was not on the hospital computer until after Johnson checked it in the course of making his rounds. The alleged negligence by Johnson therefore occurred after he admittedly had a physician-patient relationship with Wax. Additionally, there is no evidence Wax's treatment or the result would have been different had Johnson learned of the WBC when the unverified result was available in the laboratory at 7:24 a.m.

We overrule appellants' issues one, two, and three.

We affirm the judgment.