

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00426-CV

———————————————

DANA L. PLUMMER, INDIVIDUALLY AND AS SURVIVING PARENT OF
MADYSON TAVIA PLUMMER, AND RONALD K. PLUMMER, INDIVIDUALLY
AND AS SURVIVING PARENT OF MADYSON TAVIA PLUMMER, Appellants

V.

KARI G. FRANO, D.O. AND KARI G. FRANO, D.O., P.A, Appellees

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-347321-23

Before Birdwell, Womack, and Walker, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Appellants Dana L. Plummer and Ronald K. Plummer, each individually and as a surviving parent of Madyson Tavia Plummer, sued Appellees Kari G. Frano, D.O. and Kari G. Frano, D.O., P.A., for medical malpractice after Madyson's[1] death following complications from bariatric surgery. Alleging that there was no physician–patient relationship, Appellees moved for summary judgment. In five issues, Appellants appeal from the trial court's order granting summary judgment. We will affirm.

## II. BACKGROUND

### A. Madyson has a laparoscopic sleeve gastrectomy, liver biopsy, and cholecystectomy.

Madyson was a bariatric surgery patient of Folahan Ayoola, M.D., P.A. d/b/a Weight Loss Specialists of North Texas. On December 30, 2019, Dr. Ayoola performed a laparoscopic sleeve gastrectomy on Madyson at Texas Health Presbyterian Hospital Flower Mound (Presbyterian Hospital). Immediately afterwards, Dr. Tarik Al-Kalla performed a liver biopsy and cholecystectomy on her. Madyson, who was twenty-four years old, was released from the hospital the following day.

---

[1]Because Appellants share the same surname, we will use their first names for clarity.

**B. Nine days after discharge, Madyson develops problems and goes to Huguley Hospital.**

After the surgery, Madyson stayed with Dana and Ronald at their home in Joshua, Texas. On the morning of January 9, 2020, Madyson suffered from severe abdominal pain, called Dr. Ayoola's office, and was advised to go to the emergency room.

Dana drove Madyson to the emergency room at Texas Health Huguley Hospital Fort Worth South (Huguley Hospital). Approximately thirty minutes after her arrival, Madyson was seen by Dr. Mahmuda Nusrat Farha Ahmed. After a CT scan of Madyson's abdomen/pelvis with contrast, she was sent home with prescriptions for antibiotic and antifungal medications.

**C. The next morning, Madyson returns to Huguley Hospital by ambulance.**

By January 10, 2020, Madyson's pain had worsened to the point that Dana called for an ambulance to come to their home. During the transport back to Huguley Hospital, Madyson became unresponsive, and her heart stopped beating. CPR was begun, and she was administered epinephrine.

Once Madyson arrived at Huguley Hospital's emergency room, CPR continued, and her heart restarted. After tests were performed to rule out a pulmonary embolism, Dr. Adam Flink—the hospital's emergency room doctor—learned that Madyson had acute internal bleeding in her upper abdomen around her spleen. Dr. Flink then contacted Dr. Frano—the hospital's on-call general surgeon—to discuss

Madyson's condition. Dr. Frano was in the surgery department at Huguley Hospital when she received the call. According to Dr. Frano, due to her lack of familiarity with both the anatomy and the equipment involved in bariatric surgeries, she recommended that Madyson be transferred to another hospital. In addition, Huguley Hospital did not have surgeons credentialed for bariatric surgeries.

Initially, Dr. Flink sought transfer to Texas Health Harris Methodist Fort Worth Hospital (Harris Hospital), but the request was rejected. Dr. Flink then got agreement from Presbyterian Hospital to accept Madyson as a transfer patient.

## D. Madyson is transported to two other hospitals and later dies.

After arriving at Presbyterian Hospital via Careflite, Madyson had emergency surgery and was then moved to the intensive care unit. Later that night, she was moved to Medical City Plano to receive a higher level of care at a Level 1 trauma unit. After arriving at Medical City Plano, Madyson had another surgery. On January 14, 2020, Madyson died.

## E. Appellants file suit against Appellees and others, and Appellees move for and are granted summary judgment.

In April 2023, Appellants filed suit in state court against Appellees and other medical providers.[2] After answering the lawsuit, Appellees moved for traditional

---

[2]Appellants initially filed suit in December 2021 in federal court against Appellees and other medical providers. In that complaint, Appellants stated that there was "federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because [their] cause of action arises under the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd (EMTALA)" and "supplemental jurisdiction

4

summary judgment "because Dr. Frano did not have a physician–patient relationship with Madyson Plummer under Texas law." Appellants responded to the motion and filed objections to the summary judgment evidence. After a hearing, the trial court overruled Appellants' objections and granted summary judgment. Appellants moved for reconsideration of the summary judgment order, which was denied by the trial court. Later, because Appellants had also asserted claims against another physician, the trial court severed Appellants' claims against Appellees. Appellants appeal from the summary judgment order.

### III. DISCUSSION

In their first issue, Appellants complain generally that the trial court erred by granting summary judgment for Appellees. In their second, third, and fourth issues, Appellants assert that (1) Dr. Frano failed to demonstrate the absence of a genuine issue of material fact with regard to whether she had a physician–patient relationship with Madyson; (2) as a result of her contractual obligations with Huguley Hospital, Dr. Frano had a physician–patient relationship with Madyson; and (3) as a result of her affirmative actions, Dr. Frano had a physician–patient relationship with Madyson. In their fifth issue, Appellants contend that the summary judgment motion failed to

pursuant to 28 U.S.C. § 1367 over all other various state and common law claims." After discovery and some settlements, the federal court declined to exercise supplemental jurisdiction over the remaining state law claims, and Appellants proceeded with suit in state court.

address the claims that were not dependent upon the existence of the physician–patient relationship.

## A. Standard of Review

We review a summary judgment de novo. *Helena Chem. Co. v. Cox*, 664 S.W.3d 66, 72 (Tex. 2023); *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubt in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). We will affirm a traditional summary judgment only if the record establishes that the movant has conclusively proved all essential elements of the movant's cause of action (or defense, as the case may be) as a matter of law. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979); *see Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508–09 (Tex. 2010); *see also* Tex. R. Civ. P. 166a(b), (c).

## B. Claims Regarding Physician–Patient Relationship

### 1. Pleadings and Motion for Summary Judgment

In their pleadings, Appellants asserted that Dr. Frano had a physician–patient relationship with Madyson "by virtue of Dr. Frano['s] having a duty to, being compensated for, and actually serving as the on-call general surgeon for Huguley

6

Hospital on [January 10, 2020], by virtue of [her] accepting the call from Dr. Flink, and by virtue of [her] recommending, directing, and instructing Dr. Flink to transfer Madyson Plummer to another hospital." In their motion for summary judgment, Appellees denied that such a relationship—and therefore a duty to Madyson—existed. As evidence supporting their motion, Appellees attached responses to their requests for admission; medical records; and excerpts from the depositions of Ronald, Dana, Dr. Flink, and Dr. Frano.

### 2. Summary Judgment Response

In their summary judgment response, Appellants alleged two reasons that Dr. Frano had a physician–patient relationship with Madyson on January 10, 2020. First, Dr. Frano was required by contract and by hospital by-laws to provide "on-call" services to Madyson. Second, Dr. Frano "did not simply decline to provide a consultation for [Madyson] but instead used her 'clinical judgment' to diagnose the cause of [Madyson's] internal bleeding as occurring as a result of her prior bariatric surgery and 'insisted' that Dr. Flink transfer [Madyson] to a facility that performed bariatric surgery." In support of their response, Appellants attached excerpts from the depositions of Dr. Frano, Dr. Flink, and their expert witness—Dr. Robert Edward Askew, M.D.; Askew's declaration; Dr. Frano's professional services agreement with Huguley Hospital; excerpts from Huguley Hospital's "Delineation of Privileges" for General Surgery; Huguley Hospital's general surgery coverage schedule for January 2020; excerpts from Huguley Hospital's "Medical Staff Bylaws" and

7

"Medical Staff Rules and Regulations"; excerpts from responses to requests for admission; "[Appellees'] Rule 12(b)(1) and Partial Rule 12(b)(6) Motion to Dismiss and Brief in Support"[3]; and the declaration of Daniel J. Smith, Appellants' attorney.

### 3. Applicable Law

Generally, a physician–patient relationship arises when a physician agrees to provide professional medical services to a patient and the patient agrees to accept the physician's services. *See Lake Jackson Med. Spa, Ltd. v. Gaytan*, 640 S.W.3d 830, 841–42 (Tex. 2022); *see also Stutes v. Samuelson*, 180 S.W.3d 750, 753 (Tex. App.—Fort Worth 2005, pet. denied) (explaining that a physician–patient relationship "is created when professional services are offered and they are accepted by another"). Whether a physician–patient relationship exists is a threshold question of law that courts must address before the issue of the standard of care arises in a medical malpractice claim. *Ochoa v. Avila*, No. 08-23-00079-CV, 2024 WL 1311396, at *3 (Tex. App.—El Paso Mar. 27, 2024, no pet.) (citing *Estrada v. Mijares*, 407 S.W.3d 803, 806 (Tex. App.—El Paso 2013, no pet.)); *see Shah v. Kmiec*, No. 01-10-00437-CV, 2011 WL 1434676, at *4 (Tex. App.—Houston [1st Dist.] Apr. 14, 2011, no pet.) (mem. op.) (stating that the existence of a physician–patient relationship is a question of law). A physician–patient

---

[3]Appellees contend that the reference to the Rule 12 motion is an attempt to "distract" the court. Appellants respond that the motion is important because Dr. Frano claimed in it that she was at another hospital too far away to personally evaluate the patient quickly enough to prevent a delay in care, which is "compelling evidence that her post-bariatric surgery justification did not represent Dr. Frano's true reasoning."

relationship can arise in two different ways: (1) when the physician takes an affirmative step to treat the patient; or (2) when a physician is a party to a contract for the benefit of the patient. *Wax v. Johnson*, 42 S.W.3d 168, 172 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).

Only when a physician–patient relationship exists does a physician owe a patient a duty; the breach of such a duty may result in medical malpractice liability. *St. John v. Pope*, 901 S.W.2d 420, 423 (Tex. 1995). Creation of the physician–patient relationship does not require the formalities of a contract, and the fact that a physician does not deal directly with a patient does not necessarily preclude the existence of a physician–patient relationship. *Id.* at 424. "What matters is the physician's express or implied agreement to provide, and the patient's express or implied agreement to accept, the physician's 'professional services.'" *Lake Jackson Med. Spa, Ltd.*, 640 S.W.3d at 842 (citing *St. John*, 901 S.W.2d at 423).

### 4. Analysis

#### a. Did Dr. Frano take any affirmative steps to treat Madyson?

With regard to the first way to establish a physician–patient relationship—when a physician takes an affirmative step to treat a patient—it is undisputed that Dr. Frano never met or talked with Madyson, Dana, Ronald, or any other member of the Plummer family. *See Wax*, 42 S.W.3d at 172 (setting out two ways that a physician–patient relationship can arise). She also never examined Madyson. Rather, Dr. Frano's involvement with Madyson's case was limited to two telephone calls.

9

Dr. Flink—the treating emergency room physician—testified that he called Dr. Frano twice about Madyson. According to Dr. Flink,

> When I first spoke to Dr. Frano, I mentioned the patient, her current condition, and from my recollection in that phone call, Dr. Frano was - - made concerns that we didn't - - we had not identified it was the spleen at that time. There was a hematoma around the spleen, but we weren't sure, and due to the concern of the possible complications from the bariatric surgery, was recommending transfer, because we don't have any surgeons that are credentialed for bariatric surgeries at Huguley.

Dr. Flink testified that he "stressed how critical [Madyson] was, but after a minute o[r] two on the phone, I did not want to spend more time, because she kept saying transfer."

Dr. Frano agrees that she spoke with Dr. Flink twice on January 10. She testified that, in the first call, Dr. Flink consulted with her about "a critically ill patient in the emergency room that was a bariatric postoperative patient and that the CT of the chest had showed a possible intraabdominal postoperative bleeding complication from that procedure." Dr. Frano concluded that Madyson had a bariatric surgery complication "since [she] knew that [Madyson] had had bariatric surgery and she had blood in her abdomen." In a conversation described as lasting "[a] few minutes at most," Dr. Frano said that she "recommended immediate transfer to a higher level of care facility where they would have bariatric surgeons available to deal with the postbariatric procedure complication." Dr. Frano stated that it was "irrelevant" whether Dr. Flink agreed with the recommendation to transfer, but "generally, the ER doctors follow our recommendations."

10

Dr. Flink testified that he then hung up the phone and attempted to transfer Madyson to Harris Hospital, but they "declined due to the - - they did not - - I don't know the specifics, but I think it was because they didn't have bariatric surgery." After getting Presbyterian Hospital to accept the transfer, Dr. Flink said that the "accepting physician requested I talk to Dr. Frano again, at which [time] I called her back, and she, again, recommended I transfer immediately because we did not offer the services that they did." Dr. Flink testified that Huguley Hospital "did not have the surgeons that [Madyson] could potentially need, i.e., bariatric surgery."

Dr. Frano stated that in the second call—which she described as "very short"—Dr. Flink informed her that he had been in contact with a bariatric surgeon at a different facility who had asked whether anybody at Huguley Hospital—and Dr. Frano for sure—was able to help Madyson. Dr. Frano insisted that Madyson needed a specialist to operate on her because Dr. Frano was "not familiar with that detailed anatomy that they deal with, the equipment they use. So [she] wasn't willing to start something that [she] couldn't finish." She testified that she could not have operated on Madyson to stop the bleeding because she "didn't know where [Madyson] was bleeding from."

The emergency room medical records also reflected two times that Dr. Flink called Dr. Frano. The first entry stated:[4]

---

[4]We have not corrected the medical records for grammar, spelling, or punctuation.

11

Discussed with Dr. Frano with surgery and given pt a bariatric pt recommended transfer. Attempted Harris downtown however declined due to bariatric status. THR Flowermound contacted and requested I discuss with surgery again. I discussed case again with Dr. Frano who again recommend immediate transfer. Discussed again with Dr. Zahorecz at THR Flower Mound who accepted pt.

The second entry provided:

Calls-Consults
- 01/10/20 07:31:00, FRANO DO, KARI G., General Surgery\, phone call, recommends transfer to due to unable to care for bariatric patients.

Both entries were electronically signed by Dr. Flink. Dr. Frano did not personally write down anything in Madyson's chart.

Dr. Askew—Appellants' expert witness and a board-certified general surgeon—testified that Dr. Frano should have personally evaluated Madyson's condition. Then, he believed that Dr. Frano should have "done a damage-control laparotomy [and] tr[ied] to stabilize the patient." When Dr. Frano took information from and made recommendations to Dr. Flink, Dr. Askew opined that she was "exercising clinical judgment."

In addition, Dr. Askew stated that general surgeons are trained to evaluate and operate on patients with "altered or abnormal anatomy" and that they "are trained to stop bleeding and do exploratory laparotomies, regardless of whether it's a post-bariatric surgery patient." In his opinion, "Dr. Frano's sole reason to not offer [Madyson] emergent surgery because she had a recent gastric sleeve procedure is contrary to surgical training and practice." According to Dr. Askew,

12

> A board-certified general surgeon taking emergency room call at a hospital is qualified and has the duty to provide timely evaluation and treatment, including surgery, of urgent and emergent intraabdominal hemorrhages. Dr. Frano should have immediately evaluated the patient, assisted in the patient's care, and performed an emergent laparotomy to control the ongoing intra-abdominal hemorrhage.

In Dr. Askew's opinion, "By deciding not to come to the emergency room to evaluate and treat [Madyson] but instead recommending her transfer to a facility that performed bariatric surgeries, Dr. Frano allowed [Madyson] to suffer from continued bleeding and hemorrhagic shock."

Appellees rely primarily on three cases to support their argument that Dr. Frano did not establish a physician–patient relationship with Madyson. *See St. John*, 901 S.W.2d at 423; *Majzoub v. Appling*, 95 S.W.3d 432 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (op. on reh'g);[5] *Lopez v. Aziz*, 852 S.W.2d 303 (Tex. App.—San Antonio 1993, no writ). However, they mainly rely on *St. John*, stating that the resolution of this case is "controlled by [this] long-standing Texas Supreme Court precedent."

In *St. John*, Pope—who had recently undergone back surgery and epidural injections—came to the emergency room complaining of back pain and fever. 901 S.W.2d at 421. The emergency room doctor telephoned St. John, who was a board-certified internist on call at the hospital on the evening in question. *Id.* The emergency room doctor told St. John that Pope had fever, back pain, and a history of

---

[5]Both parties rely on *Majzoub*, albeit for different reasons.

recent back surgery. *Id.* Because St. John's area of specialization was not neurology or neurosurgery and the medical center was not able to handle cases involving these specialties, St. John recommended that Pope be referred to a hospital with the requisite neurosurgeon or to the physician who had performed the surgery. *Id.* at 422. The emergency room doctor agreed and indicated that he would arrange the transfer. *Id.* However, the second hospital refused to accept the transfer, and Pope went home against the advice of the medical center staff. *Id.* The next day, an ambulance transported Pope to an Austin hospital, where it was discovered that he was suffering from meningitis. *Id.* He developed several permanent disabilities from the disease. *Id.*

After the Popes filed suit, St. John moved for summary judgment on the ground that no physician–patient relationship existed between him and the Popes, and therefore he owed no duty of care. *Id.* The Popes responded with an affidavit of a board-certified internist who stated that St. John should have seen Pope personally and performed a lumbar puncture, which would have permitted a correct diagnosis, and that such a procedure was "clearly within the domain" of an internist. *Id.*

The trial court granted the motion for summary judgment. *Id.* On appeal, the supreme court affirmed the trial court, stating that the summary judgment proof conclusively established as a matter of law that St. John had no physician–patient relationship with Pope and therefore owed no duty to him. *Id.* at 424. The court reasoned, "Although St. John listened to [the emergency room doctor's] description

14

of Pope's symptoms, and came to a conclusion about the basis of Pope's condition, he did so for the purpose of evaluating whether he should take the case, not as a diagnosis for a course of treatment." *Id.* The court concluded that while a physician's agreement with a hospital may leave the physician no discretion to decline treatment of the hospital's clients, "[t]he mere fact that a doctor is 'on call' does not in itself impose any duty." *Id.*; *accord Pham v. Black*, 820 S.E.2d 209, 212 (Ga. Ct. App. 2018).

In *Majzoub*, Majzoub went to a hospital and was placed under the care of the emergency room physician. 95 S.W.3d at 434. After examining Majzoub and being mainly concerned that he heard stridor, the emergency room physician contacted Appling, the on-call otolaryngologist, and discussed how Appling normally treats patients who present with Majzoub's symptoms. *Id.* at 434–35. After the discussion, Appling said to call him if anything changed. *Id.* at 435. The emergency room physician said that he would be referring Majzoub to Appling. *Id.* Later that morning, Majzoub stopped breathing and suffered a cardiac arrest in the emergency room. *Id.* Appling was called and asked to come to the hospital to assist. *Id.* at 436. When he arrived, Appling examined Majzoub for the first time and transferred him to the intensive care unit (ICU), where he died three days later. *Id.* The trial court granted summary judgment to Appling based on its finding that, as a matter of law, Appling owed no duty to Majzoub because no physician–patient relationship existed between them before Majzoub suffered a cardiac arrest. *Id.*

15

In affirming the summary judgment, the appellate court noted that Appling did not proffer a medical diagnosis of Majzoub's condition and did not make any medical decisions with regard to Majzoub. *Id.* at 438. And nothing in the summary judgment record indicated that Appling's comments were binding on the emergency room physician or that Appling had any responsibility to control the course of Majzoub's treatment. *Id.* Holding that there was no physician–patient relationship between Appling and Majzoub prior to the time Majzoub was transferred to the ICU, the court concluded "that a duty is not automatically imposed when an on-call physician consults with an emergency room physician in regard to a patient." *Id.*

In *Lopez*, Lopez was admitted to the hospital and was placed under the care of Martinez—her primary physician—for delivery of her child. 852 S.W.2d at 304. Martinez consulted with Aziz—an OB-GYN specialist—over the phone, and Martinez testified that he sought and followed Aziz's advice. *Id.* After her baby was delivered, Lopez's condition deteriorated, and she died. *Id.* Lopez's surviving husband and children sued Aziz, alleging that he consulted with Martinez on Lopez's behalf and with her implied consent and that he failed to recommend correct treatment. *Id.* Aziz moved for and was granted summary judgment. *Id.*

On appeal, the court noted that Aziz did not contract with Martinez to perform services for Lopez, did not accept any work relating to Lopez's case, did not conduct or review any tests relating to Lopez, and did not bill either Lopez or Martinez. *Id.* at 306. Holding that there was no physician–patient relationship between Aziz and

16

Lopez as a matter of law, the court stated, "To expose physicians such as Dr. Aziz to liability for simply conferring with a colleague would be detrimental in the long run to those seeking competent medical attention and is contrary to the public policy of this state." *Id.* at 307.

Citing other appellate decisions, Appellants argue that Appellees' reliance on *St. John* and the other cases is misplaced and that determinative factual differences exist between them and the present case. *See Lake Jackson Med. Spa, Ltd.*, 640 S.W.3d 830; *Rio Grande Valley Vein Clinic, P.A. v. Guerrero*, 431 S.W.3d 64 (Tex. 2014); *Bioderm Skin Care, LLC v. Sok*, 426 S.W.3d 753 (Tex. 2014); *Majzoub*, 95 S.W.3d 432; *Lection v. Dyll*, 65 S.W.3d 696 (Tex. App.—Dallas 2001, pet. denied) (op. on reh'g); *Wheeler v. Yettie Kersting Mem'l Hosp.*, 866 S.W.2d 32 (Tex. App.—Houston [1st Dist.] 1993, no writ). Specifically, Appellants contend that "Dr. Frano did proffer a medical diagnosis (that [Madyson] was suffering from a post bariatric surgery complication) . . . and Dr. Frano did make a medical decision (she insisted that [Madyson] be transferred immediately to another facility where they would have bariatric surgeons available)." And according to Appellants, there is evidence that Dr. Frano's comments were binding on Dr. Flink due to the evidence that "Dr. Frano considered it 'irrelevant' whether Dr. Flink agreed with her recommendation because 'he's not a surgeon,' and 'whether he agrees or not,' he was 'obliged to follow [her] recommendation.'"

Appellants contend that *Lection* is most analogous to their case. There, Syed—an emergency room doctor—phoned Dyll—an on-call neurologist—to discuss a

diagnosis of a patient, Lection. *Lection*, 65 S.W.3d at 699. Dyll diagnosed Lection's condition over the phone as sounding like a "hemiplegic migraine" and told Syed that "no further treatment needed to be done for this patient at the time" and to "just have her come back to [Dyll's] office on Monday." *Id.* at 699–700. After Syed told Dyll that Lection had gone home, Dyll assured Syed that it was "all right." *Id.* The hospital records contained conflicting entries concerning whether and when Lection was discharged from the hospital. *Id.* at 700. Syed testified that what he ultimately decided to do depended upon what Dyll told him to do. *Id.*

Dyll moved for summary judgment on the basis that no physician–patient relationship existed because Lection left the hospital and the telephone conference did not create any duty of care to Lection. *Id.* The trial court granted summary judgment. *Id.* at 701.

In reversing the summary judgment, the appellate court held that the evidence that Dyll diagnosed Lection's condition, told Syed that no other treatment was necessary, and assured Syed that it was "all right" for her to have left the hospital constituted an evaluation of the information provided and a medical decision concerning Lection's need for treatment and admission to the hospital and thus Dyll committed "affirmative acts" towards Lection's treatment. *Id.* at 707. Moreover, the record contained conflicting evidence regarding whether Lection had left the hospital during the Syed–Dyll telephone call and whether Syed requested Dyll's assistance in determining Lection's diagnosis and treatment and whether to admit her. *Id.* at 708.

18

In addition, the hospital bylaws required Dyll to assist emergency room physicians and to treat all emergency room patients. *Id.* at 709.

In *Lake Jackson Med. Spa, Ltd.*, Gaytan sued a medical spa, its employee/aesthetician—Gutzman—and its medical-physician owner—Yarish—alleging that Gutzman negligently performed various skin treatments that caused scarring and discoloration and that Yarish negligently allowed Gutzman to administer the "medical treatments" even though he knew or should have known that they were improper and would cause harm. 640 S.W.3d at 834. The primary issue in the case was whether the claims constituted "health care liability claims" under the Texas Medical Liability Act. *Id.*; *see* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13) (defining "health care liability claim" to mean "a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract"). Gaytan argued that she was never a patient of Yarish, that she never saw or consulted with Yarish, and that he never examined or treated her. *Lake Jackson Med. Spa, Ltd.*, 640 S.W.3d at 841.

After examining the record, the supreme court concluded that Yarish offered, and Gaytan agreed to receive, Yarish's professional services, and Gaytan thus became his patient. *Id.* at 843 ("By seeking treatments from an employee at a medical spa

19

Dr. Yarish owned and operated, [Gaytan] necessarily sought and agreed to receive his professional services."). The supreme court held that a physician who provides services indirectly through another is ultimately responsible for the patient's safety and for ensuring that the person who provides them on the physician's behalf is appropriately trained and supervised. *Id.* Therefore, the supreme court concluded that by alleging that Yarish negligently caused her injuries and by seeking to hold him liable for that conduct, Gaytan "necessarily concede[d] that she was Dr. Yarish's patient." *Id.*; *accord Rio Grande Valley Vein Clinic, P.A.*, 431 S.W.3d at 66 ("Even if . . . a nurse performed the procedure, this does not prevent the existence of a physician–patient relationship."); *see Bioderm Skin Care, LLC*, 426 S.W.3d at 759 n.9.

In *Wheeler*, Wheeler was eight months pregnant and went to a hospital for a medical assessment regarding whether she could successfully make it to a second hospital without giving birth enroute. 866 S.W.2d at 35. Two nurses at the first hospital assessed her condition and communicated the assessment by telephone to Rodriguez, a general practitioner who was on call that day. *Id.* Rodriguez approved the transfer to the second hospital. *Id.* While she was on the way to the second hospital, Wheeler's water broke, the baby presented in a frank breech position, the birth process stopped, and the baby suffocated to death. *Id.* at 36. After suit was filed, Rodriguez contended that he did not have a physician–patient relationship with Wheeler, and the trial court granted him summary judgment.

20

In reversing the summary judgment, the appellate court noted that although "Dr. Rodriguez was not asked nor did he refuse to come in to examine the patient," he instead "was asked to evaluate certain information and make a medical decision whether Mrs. Wheeler could safely be transferred" to the second hospital, and he "willingly agreed to do so." *Id.* at 39. Therefore, he established a physician–patient relationship with Wheeler, and summary judgment was improper. *Id.* at 40.

The cases cited by Appellants are distinguishable because the physicians in those cases agreed in advance to treat the patient or took affirmative steps to diagnose and treat the patients. Here, unlike in *Lection* and the other cases Appellants rely upon, Dr. Frano made no diagnosis of Madyson, nor did she order any treatment plans or tell doctors or nurses to proceed with Madyson's care. *See Ortiz v. Glusman*, 334 S.W.3d 812, 818 (Tex. App.—El Paso 2011, pet. denied) (distinguishing *Lection*); *see also Ochoa*, 2024 WL 1311396, at *6; *Majzoub*, 95 S.W.3d at 437–38. Nothing in the record here reflects that, at the time of the two telephone conversations, Dr. Frano made any medical decisions or had any responsibility to control the course of Madyson's treatment.

Applying the principles discussed in *St. John*[6] and viewing the evidence in a light most favorable to Appellants, we cannot say that Dr. Frano took any affirmative step

---

[6]In their brief, Appellants acknowledge that *St. John* "is the only Texas Supreme Court case to specifically examine when an on-call physician has a physician–patient relationship with an emergency room patient."

to treat Madyson. *See St. John*, 901 S.W.2d at 424. Rather, the undisputed evidence showed that Dr. Frano did not agree to examine or treat Madyson because of Dr. Frano's belief that she was not able to treat a post-bariatric surgery patient and that Madyson needed a higher level of care than she could receive at Huguley Hospital. *See id.* ("At no time did St. John agree to examine or treat Pope."). Although Dr. Frano listened to Dr. Flink's description of Madyson's symptoms and concluded that Madyson should be transferred, she did so for the purpose of evaluating whether she should take the case, not as a diagnosis for a course of treatment. *See id.* ("Although St. John listened to Suarez's description of Pope's symptoms, and came to a conclusion about the basis of Pope's condition, he did so for the purpose of evaluating whether he should take the case, not as a diagnosis for a course of treatment.").

In further support of their argument, Appellants point to Dr. Askew's opinions addressing the standard of care and Dr. Frano's qualifications to conduct exploratory abdominal surgery. However, none of Dr. Askew's opinions go to the legal question of whether a physician–patient relationship existed between Madyson and Dr. Frano. *See Ochoa*, 2024 WL 1311396, at *3 (stating that whether a physician–patient relationship exists is a question of law that is addressed before the issue of standard of care in a medical malpractice case). His opinions regarding standard of care and whether Dr. Frano was qualified to treat Madyson are premature and immaterial to the threshold question of whether a physician–patient relationship existed. *See id.*

22

And even if Dr. Askew was correct and Dr. Frano erroneously determined that she could not treat Madyson, the supreme court has stated, "[A] physician may decline treatment and thereby decline to create a physician–patient relationship, even on the basis of an erroneous conclusion that the patient's condition is beyond his or her ability to treat." *St. John*, 901 S.W.2d at 423.

### b. Was Dr. Frano a party to a contract for the benefit of Madyson?

With regard to the second way to establish a physician–patient relationship—when a physician is a party to a contract for the benefit of the patient—the summary judgment evidence reflected that Dr. Frano entered into a "call contract" with Huguley Hospital in 2008. *See Wax*, 42 S.W.3d at 172 (setting out two ways that a physician–patient relationship can arise). On January 10, 2020, she was the "general surgeon" on call at the hospital, although there may have been other surgeons on call as well.

Dr. Frano admitted that on January 10, 2020, she had privileges to perform general surgery procedures at Huguley Hospital. In addition, she admitted that "when appropriate and justified by proper clinical circumstances, her privileges could include performing a laparotomy to address injuries to the abdomen and its contents," "performing surgical procedures to stabilize injuries with emergent conditions in the abdomen," and "performing a laparotomy for exploratory purposes." Dr. Frano also had privileges at Huguley Hospital to perform splenectomies.

Under the "Professional Services Agreement" entered into between Dr. Frano and Huguley Hospital, Dr. Frano was obligated to "provide medical treatment for patients of the Hospital." The hospital agreed to engage her, and Dr. Frano "agree[d] to accept such engagement to fulfill certain duties related to the practice of [her] specialty." The agreement was subject to Huguley Hospital's Medical Staff Bylaws, which required her to "[p]articipate in the Department of Emergency Medicine on-call roster, as assigned."

The agreement provided that Dr. Frano "shall provide medical treatment for patients of the Hospital" and that "[n]o individual shall be rejected as a patient of the Hospital." However, the agreement listed certain exceptions to the obligation to treat, including notably the following:

> Unless, in Physician's professional opinion, Physician does not possess the requisite skills to diagnose and/or treat the patient, or the Physician determines that the Hospital services available [are] not in the patient's best medical interest, in the Physician's sole medical judgment, in which case the Physician shall document the basis for such determination in the patient's medical record.

Although Dr. Frano did not personally make such a documentation, the medical records reflect Dr. Flink's phone calls with Dr. Frano and her opinion that "given pt. [was] a bariatric[, she] recommended transfer" and she "recommend[ed] transfer . . . due to unable to care for bariatric patients." While the agreement stated that Dr. Frano should document her determination, there was no summary judgment evidence that her failure to personally document caused a delay in treatment or affected the

24

outcome. *Cf. Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 225 (Tex. 2018) (concluding that an expert's report adequately linked his conclusion with the underlying facts where the report drew a line directly from a failure to properly document pain to a delay in diagnosis and proper treatment to the ultimate injury).

We recognize that the supreme court has noted that "a physician's agreement with a hospital may leave the physician no discretion to decline treatment of the hospital's clients." *St. John*, 901 S.W.2d at 424. But Dr. Frano's agreement with Huguley Hospital gave her such discretion.[7] Therefore, this is not the situation contemplated in *St. John* where the supreme court stated, "If any agreement existed which divested St. John of the discretion to choose whether to treat a patient, it was incumbent on Pope to present it in order to preclude summary judgment for the doctor." *Id.*

It is well established that the mere fact that Dr. Frano was "on call" did not in itself impose a duty on her to treat Madyson. *See id.* Rather, Dr. Frano's agreement with Huguley Hospital allowed her to use her "sole medical judgment" to decide that she "d[id] not possess the requisite skills to diagnose and/or treat" Madyson or that the "Hospital services [were] not in [Madyson's] best medical interest." While

---

[7]Appellants argue that the term "discretion" is never used in the relevant section of the agreement and that "discretion" is not a synonym for "professional opinion." "Discretion" is, however, the term used in *St. John*. 901 S.W.2d at 424. Moreover, the same section of Dr. Frano's agreement allowed the physician to use her "sole medical judgment."

Appellants argue that Dr. Frano's claim that she lacked skills to operate on a post-bariatric surgery patient was "merely a pretext," even if Dr. Frano's conclusion was erroneous regarding her ability to treat Madyson, Dr. Frano could decline to treat Madyson and thereby decline to create a physician–patient relationship. *See id.* at 423 (concluding "that a physician may decline treatment and thereby decline to create a physician–patient relationship, even on the basis of an erroneous conclusion that the patient's condition is beyond his or her ability to treat").

After considering all of the summary judgment evidence and applying the appropriate standard of review, we conclude that, under the facts presented here, no physician–patient relationship existed between Dr. Frano and Madyson. Accordingly, we hold that the trial court did not err by granting Dr. Frano's summary judgment on this point. We overrule issues two, three, and four.

## C. Alternative Claims

In their fifth issue, Appellants contend that the summary judgment motion failed to address their claims that were not dependent on the existence of a physician–patient relationship. According to Appellants, these include "alternative claims" against Dr. Frano for negligently agreeing to serve in the role of an on-call general surgeon and vicarious liability claims against her professional association. Appellants argue that these claims are "based upon Dr. Frano's breach of duty of ordinary care in accepting a vital role for which she allegedly knew herself not to be qualified." Appellees respond that this argument was waived because it was not made in

26

Appellants' summary judgment response and, even if it were not waived, that all of Appellants' claims are health care liability claims dependent upon the existence of a physician–patient relationship which did not exist as a matter of law.

### 1. Waiver Argument

Appellees first allege that this issue was not raised before the trial court until after summary judgment was granted and, therefore, was waived. Indeed, Appellants' summary judgment response stated, "There is only one question at issue before the Court in Defendant's summary judgment motion: Did Dr. Kari Frano have a physician–patient relationship with Madyson Plummer on January 10, 2020?" The "alternative claims" argument was not pointed out until Appellants filed their "motion for reconsideration and correction" of the summary judgment order. In that motion, Appellants assert that "[i]n addition to their medical malpractice claims, [they] asserted alternative claims against Dr. Frano for negligently agreeing to serve in the role of an on-call general surgeon at Huguley Hospital." Appellees assert that by failing to raise this issue in response to the summary judgment, it was waived. *See* Tex. R. Civ. P. 166a(c); *see also Roadside Stations, Inc. v. 7HBF, Ltd.*, 904 S.W.2d 927, 930 (Tex. App.—Fort Worth 1995, no writ) (op. on reh'g).

In addressing the waiver argument, we focus on the type of summary judgment motion that was filed. Here, only a traditional motion was filed. *See* Tex. R. Civ. P. 166a(c). A nonmovant has no burden to respond to a traditional summary judgment motion unless the movant conclusively establishes its cause of action or defense. *See,*

27

*e.g.*, *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000). Because traditional summary judgment must stand on its own merits, the nonmovant can argue on appeal that the movant's proof is insufficient as a matter of law to support summary judgment even if the nonmovant did not respond in the trial court. *Warwick Towers Council of Co-Owners v. Park Warwick, L.P.*, 298 S.W.3d 436, 443 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Therefore, we will consider Appellants' fifth issue.

### 2. Standard of Review and Applicable Law

Whether a pleading asserts a health care liability claim presents a question of law we review de novo. *Lake Jackson Med. Spa, Ltd.*, 640 S.W.3d at 836 (citing *Baylor Scott & White, Hillcrest Med. Ctr. v. Weems*, 575 S.W.3d 357, 363 (Tex. 2019)). We do so by considering the entire record, which includes the pleadings and all other "relevant evidence properly admitted." *Id.* (citing *Loaisiga v. Cerda*, 379 S.W.3d 248, 258 (Tex. 2012)).

If the act or omission alleged in the pleadings is an inseparable part of the rendition of health care services, then the claim is a health care liability claim. *Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 544 (Tex. 2004); *see* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(10) (defining "[h]ealth care" as "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement"). There is essentially a presumption that a patient's claim against her

28

physician or health care provider complains of "medical care or treatment" and thus constitutes a health care liability claim if it is based on "the defendant's conduct during the patient's care, treatment, or confinement." *Lake Jackson Med. Spa, Ltd.*, 640 S.W.3d at 844 (citing *Loaisiga*, 379 S.W.3d at 256).

Attempts to recast a health care liability claim in the language of another cause of action have been soundly rejected. *See Sorokolit v. Rhodes*, 889 S.W.2d 239, 242 (Tex. 1994). As we have stated before, if a "cause of action is based on the physician's breach of the accepted standard of medical care, the cause of action is nothing more than a health care liability claim, no matter how a plaintiff labels it." *Hart v. Wright*, 16 S.W.3d 872, 877 (Tex. App.—Fort Worth 2000, pet. denied). And a physician is liable for malpractice or negligence only when there is a physician–patient relationship. *See id.*; *see also St. John*, 901 S.W.2d at 423.

### 3. Analysis

Here, in their original petition, Appellants asserted, "Defendant Kari G. Frano, D[.]O[.], P[.]A[.] is vicariously liable for the acts of negligence of its employees, borrowed servants, and agents, including Defendant Kari G. Frano, D.O., in the care and treatment of Madyson Plummer on January 10, 2020, under the doctrine of respondeat superior." *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 541–42 (Tex. 2002) (holding that "[u]nder the doctrine of respondeat superior, an employer is vicariously liable for the negligence of an agent or employee acting within the scope of his or her agency or employment, although the principal or employer has not personally

committed a wrong"). Under their "Introductory Statement of the Case" in the pleadings, Appellants stated that the case concerns the death of a woman "caused by [Appellees'] negligence and failures to follow recognized and accepted standards of patient care." The pleadings alleged that Dr. Frano "breached the recognized standard of acceptable professional practice" and "failed to act with the ordinary and reasonable care that physicians of reasonable and ordinary prudence would provide in the same or similar circumstances, and was therefore negligent." Moreover, Appellants' pleadings stated that they had provided pre-suit notice with the required medical authorization to all Appellees pursuant to Texas Civil Practice and Remedies Code Section 74.051. And the section of the pleadings dealing with alternative claims is prefaced, "Defendant breached the recognized standard of acceptable professional practice."

Appellees' motion moved for summary judgment on "all Plaintiffs' claims," including those "against Dr. Frano and Dr. Frano's professional association." After considering the pleadings and other relevant evidence, we conclude that the essence of Appellants' claim is that Dr. Frano failed to provide quality medical care. *See MacGregor Med. Ass'n v. Campbell*, 985 S.W.2d 38, 41 (Tex. 1998). To successfully prove this claim, Appellants must prove a breach of the applicable standard of care for health care providers. *See id.* Although Appellants contend that they have pled ordinary negligence claims, in the absence of a physician–patient relationship, Dr. Frano would have no duty to do any of the things Appellants allege she negligently

30

failed to do. *See Lake Jackson Med. Spa, Ltd.*, 640 S.W.3d at 843 ("Gaytan alleges that Dr. Yarish negligently failed in this regard [failing to appropriately train and supervise his employee who provided 'nonsurgical medical cosmetic procedure'] and seeks to hold him responsible, but in the absence of a physician–patient relationship, Dr. Yarish would have no duty to do any of the things she alleges he negligently failed to do.").

Therefore, because Appellants only made allegations against Dr. Frano and no other employee of her professional association, because Dr. Frano did not have a physician–patient relationship with Madyson, because all of Appellants' claims and "alternative claims" are health care liability claims dependent on a physician–patient relationship, and because Appellees' motion for summary judgment challenged all of Appellants' claims, the trial court did not err by granting it. We overrule Appellants' first and fifth issues.

## IV. Conclusion

Having overruled all of Appellants' issues, we affirm the trial court's order granting summary judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered:  September 26, 2024

31